**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CARRIE J. SCHOTT and<br>WILMER W. SCHOTT,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES POSTAL<br>SERVICE and CITY OF DOVER,<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action No.: 06-499** |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, CITY OF DOVER'S,**</u>
<u>**MOTION TO DISMISS IN LIEU OF AN ANSWER**</u>

**I.　　Statement and Nature of Case**

On August 14, 2006, Plaintiffs, Carrie J. Schott ("Carrie") and Wilmer W. Schott

("Wilmer"), filed their Complaint claiming personal injury and loss of consortium, respectively,

as a result of an alleged slip-and-fall by Carrie.  Although a waiver of service was executed as to

Defendant, City of Dover ("City"), in September 2006, it was not filed and did not appear on the

Court's docket until December 19, 2006.  Thereafter, Plaintiffs' counsel granted defense counsel

an extension of time in which to file a responsive pleading, which was confirmed by defense

counsel.[1]

City leased land in Dover, Delaware to the United States of America ("USA") on

September 6, 1962.[2]  The lease, with a term of thirty (30) years, was renewable by USA or its

assigns, for up to 25 additional years, pursuant to paragraph four of the lease.[3]  The lease has

---

[1]　　Letter from John A. Macconi, Jr., Esq. to Benjamin A. Schwartz, Esq. dated December 22, 2006 attached as Exhibit 1.
[2]　　Assignable Ground Lease between the City of Dover and the United States of America dated September 6, 1962 attached as Exhibit 2.
[3]　　*Id.* at ¶ 4.

continually been renewed by USA and/or its assigns since the original term ended, and is

currently in effect for the contemplated land.  The following provision was included in the lease:

> The tenant, at tenant's own cost and expense, shall maintain the
> demised premises, including all buildings, structures and
> improvements constructed thereon, in good condition of repair and
> in compliance with all requirements of law.[4]

Shortly after the lease was first entered into, a United States Post Office building was constructed

on the land, at 55 The Plaza, Dover, Delaware.

Plaintiffs' suit centers on an alleged slip-and-fall sustained by Carrie on the land.  On

August 14, 2004, she was walking toward the Post Office's main entrance on a sidewalk in front

of the building.  Two persons, also walking on the sidewalk, approached from the opposite

direction, so Carrie stepped off the sidewalk and onto the aligning grass.  When she did so, she

stepped on an exposed tree root that Plaintiffs have described as "protrud[ing] above the ground

level," and "clear."[5]  Her foot slipped off the root and she fell.

## II.    Plaintiffs fail to state a claim upon which relief may be granted, and their action must be dismissed, because Defendant had relinquished possession and control of the leased property.

### A.    Standard of Review

In deciding a motion to dismiss, a plaintiff's allegations must be accepted as true,[6] and

dismissal is warranted if it is "clear that no relief could be granted under any set of facts that

could be proved consistent with the allegations."[7]  In addition to the Complaint's allegations, a

court may consider "exhibits attached to the [C]omplaint, matters of public record, and

---

[4]    *Id.* at ¶ 24.
[5]    Plaintiffs' Complaint at ¶ 11.
[6]    *See Hishon v. King*, 467 U.S. 69, 73 (1984).
[7]    *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

documents that form the basis of a claim."[8]  Motions to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6) shall be treated as motions for summary judgment when matters outside the

pleadings are presented to the court.[9]

> **B.    Lessors who relinquish possession and control of leased property owe no duty to persons entering that property with respect to conditions thereon and cannot be held liable for injuries to those persons.**

Established federal and state court precedent provides that a lessor who no longer has

possession or control over leased property owes no duty to third persons coming upon the

property with respect to conditions thereon, and is not liable for injuries to those persons.[10]

In *Larson v. Straff*,[11] the Third Circuit Court of Appeals stated that, generally, "[a]

landlord owes no duty to persons coming upon the premises for conditions present at the time of

the tenant's entrance,"[12] essentially echoing Restatement (Second) of Torts § 356.[13]  The Court

was asked to decide post-trial questions, including whether proper instructions were given by the

trial court to the jury about this issue.  Additionally, the Court termed the rule a rigid one of

nonliability, and provided that there are only a couple of narrow exceptions to it.[14]

---

[8]    *Brown v. Daniels*, 128 Fed. Appx. 910, 913 (3rd Cir. 2005)(citations omitted)(attached as Exhibit 3); *Lum v. Bank of America*, 361 F.3d 217, 222 n.3 (3rd Cir. 2004).

[9]    FED R. CIV. P. 12(b).

[10]    *E.g.*, *Larson v. Straff*, 340 F.2d 180 (3d Cir. 1964); *Volkswagen of America, Inc. v. Costello*, 880 A.2d 230 (Del. 2005). *Cf. Craig v. A.A.R. Realty Corporation*, 576 A.2d 688 (Del. Super. Ct. 1989)(holding that non-possessory landowners must exercise control amounting to actual management of leased premises to have duty to protect tenants' invitees from criminal attacks on premises).

[11]    340 F.2d 180 (3d Cir. 1964).

[12]    *Id.* at 186.

[13]    Section 356 of the Restatement (Second) of Torts states:
> Except as stated in §§ 357-362, a lessor of land is not liable to his lessee or to others on the land for physical harm caused by any dangerous condition, whether natural or artificial, which existed when the lessee took possession.

RESTATEMENT (SECOND) OF TORTS § 356 (1965).

[14]    *Larson*, 340 F.2d at 186.

In *Volkswagen of America, Inc. v. Costello*,[15] the Delaware Supreme Court reached the same conclusion by slightly different means, relying instead on Restatement (Second) of Torts § 355.[16]  The case involved a physically injured employee of a lessee company and a second company that leased a facility to the lessee, but that did not completely relinquish possessory control of the facility.[17]  The Court ultimately reversed the trial court's judgment for a variety of reasons, but not before, most pertinently, discussing a lessor's duty to third persons upon leased property.  Quoting from Restatement (Second) of Torts § 355, the Court stated that "a lessor of land is not subject to liability to his lessee or others upon the land with the consent of the lessee or sublessee for physical harm caused by any dangerous condition which comes into existence after the lessee has taken possession."[18]  The Court also acknowledged an exception to the rule – namely, when a lessor retains a degree of control over the leased property.[19]

In the present case, City owed no duty to Carrie with respect to the tree root and cannot be held liable for her alleged injuries because it relinquished possession and control of the land upon its being leased to USA.  Nor can City be held liable on Wilmer's claim as it is merely derivative of his wife's claim.[20]

City has not possessed the land since September 6, 1962, and instead USA and its assigns have as evidenced by the lease's continually being renewed and in effect.  Further, a United States Post Office building was erected shortly after the lease's origination, a building that has always been, and continues to be, used by the United States Postal Service.  There has been no

---

[15]     880 A.2d 230 (Del. 2005).

[16]     *Id.* at 233.

[17]     *Id.* at 231-32.

[18]     *Id.* at 233.  The beginning phrase of Restatement § 355, omitted by the Court, is "[e]xcept as stated in §§ 357 and 360-362 . . . ."

[19]     *Volkswagen of America, Inc.*, 880 A.2d at 233.

[20]     *See Rizzo v. E.I. duPont de Nemours & Company*, 1989 Del. Super. LEXIS 450, at *11 (loss of consortium claims are derivative claims)(attached as Exhibit 4); *Beatty v. Smedley*, 2003 Del. Super. LEXIS 437, at *2 n.1 (same)(attached as Exhibit 5).

suggestion made that, at any time since the lease's inception, City has held a possessory interest in the land.

City has similarly not exerted control over any part of the land at any time since September 6, 1962, either directly or indirectly. Specifically, City has not itself, nor has it indirectly by instructing or requiring things of USA and/or its assigns. Rather, the parties agreed at the time of the lease, by the provision stated above, that USA alone would be responsible for maintaining the premises. That shift of responsibility simultaneously, and consequently, shifted control to USA. As stated previously, the lease has continually been in effect since its inception, with USA, and not City, having the same responsibility and control.

This result is the same regardless of whether the tree root is considered a condition existing at the time of, or after, the lease, under *Larson* and *Volkswagen of America, Inc.* and Sections 355 and 356 of the Restatement (Second) of Torts. Subject to a few narrow exceptions, that are inapplicable in the present case, a lessor owes no duty to persons entering leased property with respect to conditions on the property, whether they existed at the time of the lease or came into existence afterward. While it may seem illogical to do so, even assuming, *arguendo*, that the tree root was, forty-four years ago, exactly as it was on the day of Carrie's alleged fall is of no matter. Any duty associated with the root would be of USA, not City. The same is true of post-lease conditions, as explained above.

Finally, as mentioned, there are exceptions to the general rule, albeit narrow exceptions. Nevertheless, none of them are applicable in the present case. The exceptions are provided in Restatement §§ 357-362. Those explored by *Larson* and *Volkswagen of America, Inc.* are contained in the Restatement and are not in addition thereto. For ease of reference, the

Restatement sections have been attached to this memorandum of law.[21]  Because an exception-by-exception "contrast" analysis to the present case would become cumbersome, and for the sake of brevity, City contends, again, that none of the exceptions apply in this case.  Each one considers factual circumstances different than exist in this case, including an affirmative act on lessor's part, such as repairing the leased land or retaining control over it, and undisclosed dangerous conditions known to the lessor.  Because the attached exceptions represent the only ones to the general rule, and because none apply here, the general rule applies to obviate a duty on City's part, as lessor, to Carrie.  Consequently, as City owed no duty to Carrie, it cannot be held liable for her alleged injuries or on Wilmer's derivative claim.

### III.    Plaintiffs fail to state a claim upon which relief may be granted, and their action must be dismissed, because the tree root was an "open and obvious" condition.

#### A.    Standard of Review

In deciding a motion to dismiss, a plaintiff's allegations must be accepted as true,[22] and dismissal is warranted if it is "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."[23]  In addition to the Complaint's allegations, a court may consider "exhibits attached to the [C]omplaint, matters of public record, and documents that form the basis of a claim."[24]  Motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) shall be treated as motions for summary judgment when matters outside the pleadings are presented to the court.[25]

---

[21]    Sections 357-362 of the Restatement are attached as Exhibits 6 through 11, respectively.

[22]    *See Hishon*, 467 U.S. at 73.

[23]    *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

[24]    *Brown*, 128 Fed. Appx. at 913 (citations omitted)(attached as Exhibit 3); *Lum*, 361 F.3d at 222 n.3.

[25]    FED. R. CIV. P. 12(b).

**B.     A landowner has no duty to cure a condition upon land where that condition is "open and obvious."**

Federal court precedent has routinely provided that where a condition upon land is "open and obvious," no duty is imposed upon the landowner with regard to the condition or its cure.[26]

In *Centanni v. United States Postal Service*,[27] the plaintiff brought suit for personal injuries sustained as a result of a fall on United States Post Office grounds.[28] As she proceeded along a sidewalk on the grounds, she encountered a woman in her path and left the sidewalk to "take a 'short-cut' between a live oak tree and the building."[29] Although posts and a chain fence had been erected to deter such short-cuts, other postal service patrons had broken the chains and damaged the fence.[30] The plaintiff's foot caught on one of the chains during her attempt to maneuver through the area, and she fell on the tree's roots.[31] The Court, in granting the defendant's motion to dismiss, held that, primarily because the roots and damaged fencing were obvious to passers-by, they could not constitute unreasonably dangerous conditions and defendant, therefore, had no duty to cure them.[32]

In *Brown v. United States of America*,[33] the plaintiff was traversing United States Post Office grounds with which he was familiar when his foot was caught on an exposed oak tree root.[34] The plaintiff fell and sustained personal injury.[35] The Court held that, although the tree root was a potentially dangerous condition, the defendant had no legal duty to warn about, or

---

[26]     *E.g., Centanni v. United States Postal Service*, 2004 U.S. Dist. LEXIS 3050 (E.D. La.)(attached as Exhibit 12); *Brown v. United States of America*, 861 F.Supp. 539 (W.D. La. 1994).
[27]     2004 U.S. Dist. LEXIS 3050 (E.D. La.)(attached as Exhibit 12).
[28]     *Id.* at *1.
[29]     *Id.* at *1-2.
[30]     *Id.* at *2.
[31]     *Id.*
[32]     *Id.* at *8-10.
[33]     861 F.Supp. 539 (W.D. La. 1994).
[34]     *Id.* at 540.
[35]     *Id.*

cure, it because  it was "obvious, easily avoidable . . . and . . . known to the [plaintiff]."[36]  To impose such a duty, reasoned the Court, "would put a severe burden on virtually all landowners to remedy a risk that does not merit such a burden."[37]

In the present case, the tree root was "open and obvious" which obviated a duty on City's part to remedy the condition in any way.  The cited cases plainly provide that where a condition upon land is obvious, even if potentially dangerous, the landowner has no duty as to the condition.  Plaintiffs reveal that the tree root was obvious to Carrie by the language in their own Complaint, describing it as "protrud[ing]" and "clear."  Therefore, a duty must necessarily not be attributed to City.  The analysis is as straightforward as it appears.

This conclusion is bolstered by Carrie's decision to step off the sidewalk and *Brown's* rationale.  When Carrie chose to step off the sidewalk, regardless of her motive for doing so, she knowingly subjected herself to an obvious condition.  Because her foot landed directly on that condition, and not simply near it, so as to avoid a mishap, is of no matter.  She confronted an evident risk and lost, but cannot now hold another responsible for that decision.  Were she allowed to do so would be to place a severe, unmeritorious burden on City, as stated in *Brown*.

---

[36]    *Id.* at 542-43 (citations omitted).
[37]    *Id.* at 543.

**IV.    Conclusion and Prayer for Relief**

Based on the foregoing, Plaintiffs' action against Defendant City of Dover should be

dismissed.


**MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN**


*/s/ John A. Macconi, Jr.*

_____
DANIEL A. GRIFFITH, ESQ. (Del. Bar ID No. 4209)
JOHN A. MACCONI, JR., ESQ. (Del. Bar ID No. 4430)
1220 North Market St., 5th Floor
P.O. Box 130
Wilmington, DE  19899-0130
*Counsel for Defendant City of Dover*

DATED: January 12, 2007

A REGIONAL DEFENSE LITIGATION LAW FIRM

**MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN**

A  P R O F E S S I O N A L   C O R P O R A T I O N    www.marshalldennehey.com

**1220 N. Market St., 5th Floor, P.O. Box 8888 · Wilmington, DE 19899-8888**
**(302) 552-4300 · Fax (302) 651-7905**

Direct Dial: 302-552-4377
Email: jamacconi@mdwcg.com

**PENNSYLVANIA**
Bethlehem
Doylestown
Erie
Harrisburg
King of Prussia
Pittsburgh
Philadelphia
Scranton
Williamsport

**NEW JERSEY**
Cherry Hill
Roseland

**DELAWARE**
Wilmington

**FLORIDA**
Fort Lauderdale
Jacksonville
Orlando
Tampa

**OHIO**
Akron

December 22, 2006



**VIA FASCIMALE**

Benjamin A. Schwartz, Esquire
Schwartz & Schwartz
1140 South State Street
Dover, DE 19901

> Re:     **Schott v. City of Dover**
>         **Our File No: 20021-00131**
>         **C.A. No: 06-498**

Dear Ben:

This letter is to confirm that you have agreed to give us an extension to file a responsive pleading until January 12, 2007 in the above-referenced matter

Thank you for your courtesy.  Happy Holidays.

Very truly yours,

/s/ *John A. Macconi, Jr.*

JOHN A. MACCONI, JR.

JAM/hr

\15_A\LIAB\JAMACCONI\CORR\398146\HXRUSSO\20021\00131

<u>ASSIGNABLE GROUND LEASE</u>

1.  This Lease executed this _6th_ day of _September_, 1962, by and between the City of Dover, in the County of Kent, State of Delaware, acting through the Mayor and Council, hereinafter called Owner, and the United States of America, acting by and through the Post Office Department, hereinafter called the Government.

WHEREAS, the Council of the City of Dover has on August 20, 1962, by unanimous vote, adopted and passed a Resolution (copy of said Resolution attached hereto titled Exhibit "A" and made a part hereof), to lease land in the City of Dover, County of Kent, State of Delaware, to the United States Post Office Department for the purpose of the construction and operation of a post office; said premises being located immediately West of Legislative Avenue extended and North of East Loockerman Street, more fully described by a legal description and a survey attached hereto titled Exhibit "B" and made a part hereof.

2.  TO HAVE AND TO HOLD said premises, together with the tenements, hereditaments, appurtenances, and easements thereunto belonging, for the primary term of Thirty (30) years, commencing with the first day of the basic term of the lease hereinafter mentioned in Paragraph 8, which lease is to be executed between the Government and the tenant hereinafter described in Paragraph 8.

3.  The Government covenants and agrees to pay owner as rent for the demised premises during the above mentioned primary term the sum of One Dollar ($1.00), receipt hereof acknowledged, per annum payable at the end of each calendar year.

4.  The Government or its assigns shall have the privilege of renewing this lease for the following five (5) terms and rentals with the first of such renewal terms commencing on the day following the expiration of the primary term and with all other terms and conditions of the basic lease to remain the same during said renewal terms, viz:

        (1)  Five (5) years at $1.00 per annum.
        (2)  Five (5) years at $1.00 per annum.
        (3)  Five (5) years at $1.00 per annum.
        (4)  Five (5) years at $1.00 per annum.
        (5)  Five (5) years at $1.00 per annum.

5.  The option of renewing this lease shall be exercised by causing to be delivered to the Owner, by certified or registered mail, written notice of renewal and said notice shall be mailed to the Owner at least sixty (60) days prior to commencement of such renewal period.

6.  The Owner warrants that Owner is the sole Owner of the above described leased property and the Owner has the right and authority to execute this lease.

7. The Owner covenants and warrants that the Government and (The Government's assignee hereof), hereinafter called the "Tenant" shall peaceably and quietly have, hold and enjoy the said premises for the term hereof and, for all renewal terms hereof, if the option thereof is exercised, subject to the terms, covenants, conditions, provisions and agreements hereof, and further agrees, that if there are any mortgages or other liens against the demised premises which are prior in time or right to this lease, to furnish the Government an agreement from such lienors that if they should ever foreclose or otherwise enforce their lien against the property they will do so subject to this lease and the rights of the tenant and Government hereunder.

8. It is mutually understood that the Government desires to transfer and assign this lease to a person, partnership, or corporation, hereinafter called the "Tenant", for the construction on the demised premises of a post office and incidental facilities according to the building and design requirements of the Government and to lease same back to the Government for a term of years.

9. The Owner hereby agrees that if, within twelve (12) months from the date hereof, the Government is unsuccessful in its efforts to obtain a responsible lease contractor to construct a postal facility on the demised premises and lease same to said Government then this ground lease shall thereupon be terminated and of no further force and effect.

10. The Owner hereby agrees that immediately upon assignment of this lease by the Government to the tenant, the Owner will give the tenant the exclusive possession of the above-described premises for the purpose of permitting said tenant to construct a post office and incidentals to accomplish such construction.

11. It is mutually agreed that the Government shall be relieved from all liabilities to the Owner under the terms of this lease upon Government's assigning this lease to the tenant in conformity with the terms, covenants and conditions herein, save and excepting any liability which may have accrued prior to the time of said assignment under the provisions of Paragraph 14, hereof, or which may accrue under the provisions of Paragraphs 19 or 20 hereof; and providing further that such tenant, in writing, agrees to accept and, comply with each and all of the terms, conditions and covenants contained in this lease.

12. Within twenty (20) days after the assignment of this lease, the tenant, by the acceptance of the assignment of this lease, agrees to notify the Owner, in writing, of the assignment and to accept and comply with each and all the terms, conditions and covenants contained in this lease.

13. By the acceptance of the assignment of this lease, the tenant agrees to pay, in addition to the rents provided herein, all municipal, county, and state taxes, all assessments of every kind and character, general or special water and sewer rents or rates, electric and gas charges, and all license fees or charges that may be properly levied or assessed against the demised premises or the building or improvements thereon from and during the lease term and any renewal terms herein.

14. The Government, for the period prior to the time it assigns this lease to the tenant, hereby agrees to save harmless and indemnify the owner from all claims, loss, damage, actions, causes of action, expense and/or liability resulting from the use of said property by the United States whenever such claim, loss, damage, actions, causes of actions, expense, and/or liability arise from the negligent or wrongful act or omission by an employee while acting within the scope of his employment, under circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the negligent or wrongful act or omission occurred.

15. The tenant agrees, by accepting the assignment of this lease, to hold the Owner harmless for any claim for damages for personal injury or for property damage during the period of demolition and construction of the post office facilities, and also during the existence of this lease. In addition, the tenant agrees to keep the premises insured with a reputable company at all times during the existence of this lease, with a minimum amount of $100,000/$300,000 insurance for public liability and $10,000.00 for property damage. Tenant shall provide Owner with copies of such policies.

16. Tenant agrees to comply with all federal, state, county and municipal regulations, ordinances or rules which may apply to construction on the demised premises, and the use thereof, and shall be responsible for all costs of demolition.

17. Within sixty (60) days after completion of construction of the Post Office facilities, the tenant shall furnish to the Owner two (2) sets of the plans and specifications, together with amendments, if any, to said plans and specifications used in said construction, in detail, showing location of all underground and above ground utility lines, as well as construction detail.

18. At the termination of this lease, whether through failure of the Government to exercise the renewal options in its lease with tenant, or otherwise, title to said demised premises and all buildings, structures and improvements, located thereon shall vest in the Owner.

19. Should the lease between the Government and its Assignee (the tenant herein) terminate prior to the last day of the last aforementioned renewal term of this assignable ground lease, the owner hereby agrees that the Government may remove its machines, trade fixtures, and similar equipment of the type commonly installed for the use for the operation of a Post Office even though they are attached to the floors, walls or roofs of the buildings, structure or improvements, provided that they can be removed without structural or other damage to the buildings, structures or improvements which cannot be repaired; and, provided further, that if such removal damages any part of the buildings, structures, and improvements, the Government shall repair such damages and restore such buildings, structures, and improvements to as near as possible the condition the same were in at the time of the construction thereof with reasonable wear and tear from postal use and action of the elements excepted.

20. The agents, employees or representatives of the Government or of lease bidders shall have the right, upon the execution of this agreement, subject to the use made of the premises by the owner, to enter upon said premises for the sole purpose of inspecting the same and making test borings, plans and topographical surveys in connection with the tenant's contemplated use of the premises. The Government or each lease bidder, as the case may be, at its own expense shall promptly restore the property of the owner as near as possible to its original condition in accordance with good engineering practice.

21. If, during the term of this lease or any renewal terms thereof, it becomes necessary for the owner to repossess said demised premises from the tenant herein, such repossession shall be accomplished subject to the hereinbefore described lease between the tenant hereunder (The Government's assignee of this lease ) and the Government.

22. In the event of the occurrence of any condition or conditions which would in the absence of the provisions of this paragraph, then give the owner the right to cancel this lease, the owner shall not have said right unless the owner shall have given written notice by registered mail of said occurrence to the Post OfficeDepartment and to the tenant's mortgagee, if any, and shall have afforded the Post Office Department and the mortgagee not less than 45 days opportunity of such additional time as the owner shall allow, after such mailing of such notice, to cure the default by the tenant and the condition or conditions giving rise to said right or rights.

23. The term "tenant" as used herein means the person, firm or corporation taking an assignment of this lease from the Government, and the heirs, personal representatives, successors and assigns of the tenant.

24. The tenant, at tenant's own cost and expense, shall maintain the demised premises, including all buildings, structures and improvements constructed thereon, in good condition of repair and in compliance with all requirements of law.

25. By the acceptance of the assignment of this lease, the assignee (tenant herein) hereby agrees to obtain and keep in effect at all times during the term of this lease fire and extended coverage insurance upon all buildings, structures and improvements constructed on said demised premises (exclusive of foundations). Such policy or policies of insurance shall be for not less than eighty percent (80%), of the insurable value of the property covered and shall provide for payment of losses to the tenant. The tenant shall expend such payment for the repair or restoration of the building.

26. If during the term or any renewal terms the buildings or improvements on, in or appurtenant to the demised premises at the commencement of the term or thereafter erected thereon or therein shall be destroyed or damaged in whole or in part by fire or other cause, tenant shall give to owner immediate notice thereof, and tenant shall promptly repair, replace and rebuild the same, at least to the

Assignable Ground Lease – Dover, Delaware                    Page 5 of 6 Pages

extent of the value and as nearly as possible to the character of the buildings and improvements existing immediately prior to such occurrence; and owner shall in no event be called upon to repair, replace or rebuild any such buildings or improvements. The tenant shall continue to pay rent hereunder during the terms said premises shall be damaged or destroyed.

27. The Owner agrees to grant unto the tenant all rights to and privileges to the use of storm sewer pipes lying in the demised premises, and further, the Owner agrees to assume the proper operation and maintenance of said storm sewer pipes, however, connections and/or alteration to said storm sewer pipes for use of tenant shall be the responsibility of the tenant.

28. This lease is subject nevertheless to any or all easements, rights-of-way, or any other clouds upon the title whether or not of record.

IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals the day and year first above written.

Witness:                                        UNITED STATES OF AMERICA

_____        By:_____

(SEAL)

WASHINGTON             )   SS
DISTRICT OF COLUMBIA )

On this        day of             , 1962, before me appeared _____, to me personally known, who being by duly sworn, did say that he is the _____ and that the seal affixed to said instrument is the seal of the Post Office Department and that said instrument was signed and sealed in behalf of the United States of America by Authority of Law, and said _____ acknowledged said instrument to be the free act and deed of the United States of America.

(SEAL)                                _____
                                              Notary Public

My commission expires:

Assignable Ground Lease - Dover, Delaware          Page 6 of 6 Pages

City of Dover, County of Kent, State
of Delaware, acting through the
Council of the City of Dover

ATTEST:

_____          BY: _____
         erk                                Mayor, City of Dover

.ved as to names and form
execution

BY: _____

Assignable Ground Lease – Dover, Delaware

## EXHIBIT "A"

RESOLUTION AUTHORIZING MAYOR AND COUNCIL TO ENTER INTO AGREEMENT WITH THE UNITED STATES OF AMERICA.

WHEREAS, the Mayor and Council of the City of Dover have sought to locate within the City limits of The City of Dover a new Post Office Building, and

WHEREAS, the United States of America, acting through the Post Office Department is desirous of leasing the premises upon which the Post Office Building is to be located, and

WHEREAS, the area in question is immediately west of Legislative Avenue extended and north of East Loockerman Street,

NOW, THEREFORE, BE IT RESOLVED BY THE MAYOR AND COUNCIL IN COUNCIL MET:

    1.  That the ground lease submitted to the Mayor and Council for their approval shall be entered into by the proper city officials acting on behalf of the Mayor and Council.

    2.  That the proper city officials are hereby authorized to affix their hand and seal to the ground lease and to thereby bind the City of Dover to the terms and conditions set forth therein.

Passed August 20, 1962

Assignable Ground Lease – Dover, Delaware

<u>EXHIBIT "B"</u>

LEGAL DESCRIPTION

ALL THAT CERTAIN piece or parcel of land lying and being situate on the North side of East Loockerman Street, in the City of Dover, East Dover Hundred, Kent County and State of Delaware and being more particularly described as follows, to wit:

BEGINNING at the point of intersection of the westerly right of way line of Legislative Avenue Extended with the northerly right of way line of East Loocker-man Street thence with the said right of way line of East Loockerman Street the f following three courses: By the chord of an arc of a circle of 286.65 ft. radius N86°48'W 54.68 ft. to a point of reverse curvature thence by the chord of an arc of a circle of 231.07 ft. radius N89°19'W 85.67 ft. to a point of tangent, thence S80°00'W 13.16 ft. to a new point now established thence by a new line now established separating this parcel from other lands of the City of Dover N11°29'30"W 269.27 ft. to a corner for lands of the City of Dover and lands of Richardson and Robbins, thence with lands of Richardson and Robbins the following three lines N7°19'30"W 45.00 ft., N75°00'E 148.44 ft. to a point in the right of way of Legislative Avenue extended thence with said right of way of Legislative Avenue extended S11°14'30"E 375.50 ft. home to the place of beginning and containing 1.218 acres of land be the same more or less.

Service: **Get by LEXSEE®**
Citation: **128 fed. appx. 910**

*128 Fed. Appx. 910, \*; 2005 U.S. App. LEXIS 7132, \*\**

KEVIN E. BROWN; ERICA BROWN, Appellants v. TINA DANIELS; BRANDY NEIDER; BERKS COUNTY CHILDREN AND YOUTH SERVICES

No. 04-3664

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

128 Fed. Appx. 910; 2005 U.S. App. LEXIS 7132

April 4, 2005, Submitted Under Third Circuit LAR 34.1(a)
April 25, 2005, Filed

**NOTICE: [\*\*1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Motion denied by Brown v. Daniels, 2006 U.S. Dist. LEXIS 45274 (E.D. Pa., June 15, 2006)

**PRIOR HISTORY:** On Appeal From the United States District Court For the Eastern District of Pennsylvania. (D.C. Civ. No. 03-cv-04242). District Judge: Honorable Petrese B. Tucker.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant parents challenged the dismissal of their 42 U.S.C.S. § 1983 action against appellees, children and youth agency, an employee, and a supervisor, from the U.S. District Court for the Eastern District of Pennsylvania because they failed to state a claim for violations of their due process rights or of the Child Protective Services Law, 23 Pa. Cons. Stat. Ann. § 6301 et seq., and appellees were entitled to qualified immunity.

**OVERVIEW:** The parents first argued that the district court erred in considering materials outside of the pleadings when it granted appellees' Fed. R. Civ. P. 12(b)(6) motion to dismiss. The court disagreed. The district court only relied upon those documents that were a matter of public record or were integral to the parents' claims and that by relying upon the documents themselves, the parents had notice that they would be considered. The court affirmed the dismissal of the parents' claims against the supervisor and the agency because the complaint contained no allegation of the supervisor's involvement but attempted to hold her responsible because of her supervisory position. With regard to the agency, the complaint failed to identify established customs or policies that resulted in the violations. The parents' claims that the employee violated their rights by examining the child for bruises, notifying the father's employer of the abuse allegations, and harassing them "during the healing process" were properly dismissed because the employee's actions did not shock the conscience. The parents sufficiently alleged a violation of their procedural due process rights against the employee.

**OUTCOME:** The court vacated the district court's judgment as to the parents' procedural due process claim against the employee. The court affirmed the district court's judgment in favor of all appellees as to the remainder of the claims.

**CORE TERMS:** post-deprivation, motion to dismiss, qualified immunity, custody, protective custody, prompt, notifying, emergency, removal, maternal grandmother, informal hearing, due process, conscience, approving, quotation, healing, notice, shocks, juvenile, thighs, affirmative defense, judicial review, collectively, involvement, conclusory, whereabouts, harassing, integral, custom, vacate

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation 

*HN1*⊥ Conclusory allegations are simply insufficient to state a claim. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims 

*HN2*⊥ A court need not credit a complaint's bald assertions or legal conclusions when deciding on a motion to dismiss. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims 

Civil Procedure > Appeals > Standards of Review > De Novo Review 

*HN3*⊥ An appellate court's standard of review of a district court's dismissal under Fed. R. Civ. P. 12(b)(6) is plenary. The court of appeals must determine whether, under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief, and we must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims 

*HN4*⊥ In deciding motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), courts generally consider only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. A document forms the basis of a claim if it is integral to or explicitly relied upon in the complaint. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims 

Civil Procedure > Pleading & Practice > Pleadings > Answers 

Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims 🗐

*HN5*⊥ A Fed. R. Civ. P. 12(b)(6) defense for failure to state a claim may be raised in a pre-answer motion. R. 12(b). More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims 🗐

*HN6*⊥ See Fed. R. Civ. P. 12(a)(4)(A).

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims 🗐

Civil Procedure > Pleading & Practice > Pleadings > Answers 🗐



*HN7* ⬇ If a district court grants a motion to dismiss, the plaintiff's action is dismissed and an answer is no longer required.  More Like This Headnote

Civil Procedure > Appeals > Standards of Review > General Overview 🗎

*HN8* ⬇ A court of appeals may affirm a district court on any grounds supported by the record.  More Like This Headnote

Civil Rights Law > Immunity From Liability > Local Officials > General Overview 🗎

Civil Rights Law > Immunity From Liability > Respondeat Superior Distinguished 🗎

Civil Rights Law > Section 1983 Actions > Scope 🗎

*HN9* ⬇ Liability in a 42 U.S.C.S. § 1983 action must be predicated upon personal involvement, not on the basis of respondeat superior. In order to establish liability on the part of a government agency, plaintiffs would have to show that it had an established policy or custom that resulted in the alleged constitutional violations.  More Like This Headnote

Constitutional Law > Substantive Due Process > Privacy > Personal Decisions 🗎

Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Domestic Offenses > Child Abuse > Elements 🗎

Family Law > Family Protection & Welfare > Children > Abuse, Endangerment & Neglect 🗎

*HN10* ⬇ Parents have a liberty interest in the care, custody, and management of their children. This interest, however, must be balanced against the state's interest in protecting children suspected of being abused. The right to familial integrity, in other words, does not include a right to remain free from child abuse allegations. In cases where abusive action by a member of the executive branch is alleged, only the most egregious official conduct can be said to be arbitrary in the constitutional sense. Thus, to generate liability, the executive action alleged must be so "ill-conceived or malicious" that it "shocks the conscience."  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection 

Family Law > Family Protection & Welfare > Children > General Overview 🗎

Family Law > Parental Duties & Rights > Consent > General Overview 🗎

*HN11* ⬇ In emergency circumstances, which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or an order of the court. However, in those extraordinary situations where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed. Thus, when the state removes a child from his parents, due process guarantees prompt and fair post-deprivation judicial review.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection 

Family Law > Family Protection & Welfare > Children > General Overview 

*HN12* The requirements of due process may be delayed where emergency action is necessary to avert imminent harm to a child, provided that post-deprivation process to ratify the emergency action is promptly accorded. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection

Family Law > Family Protection & Welfare > Children > General Overview

*HN13* Although there is no bright-line rule for deciding whether a post-deprivation hearing involving the removal of a child from the parents is sufficiently "prompt," the delay should ordinarily be measured in hours and days, as opposed to weeks. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims

Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies

*HN14* Although qualified immunity is an affirmative defense, a complaint may be subject to dismissal under Fed. R. Civ. P. 12(b)(6) when an affirmative defense appears on its face. Thus, qualified immunity will be upheld on a R. 12(b)(6) motion only when the immunity is established on the face of the complaint. More Like This Headnote

Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies

*HN15* Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional laws of which a reasonable person would have known. A right may be clearly established even if there is no previous precedent directly in point. The ultimate issue is whether reasonable officials in the defendants' position at the relevant time could have believed that, in light of what is in the decided case law, that their conduct would be lawful. More Like This Headnote

**COUNSEL:** KEVIN E. BROWN; ERICA BROWN, Appellants, Pro se, Reading, PA.

For TINA DANIELS; BRANDY NEIDER; BERKS COUNTY CHILDREN AND YOUTH SERVICES, Appellees: Paola T. Kaczynski, Holsten & Associates, Media, PA.

**JUDGES:** BEFORE: ALITO, SMITH and BECKER, CIRCUIT JUDGES.

**OPINION:**

[*911] PER CURIAM

Kevin Brown and Erika Brown (collectively, "the Browns") appeal pro se from the order of the United States District Court for the Eastern District of Pennsylvania dismissing their action filed pursuant to 42 U.S.C. § 1983. For the reasons that follow, we will affirm in part and vacate in part the District Court's judgment.

[*912] Because we write only for the parties, we will briefly summarize only those facts essential to our disposition of this appeal. On May 21, 2003, the Browns' minor child,

Travonne Lydell Wilson, was removed from their home by **[\*\*2]** his maternal aunt, Catherine Smith. Smith then transported Travonne to Berks County Children and Youth Services ("BCCYS"), where he was interviewed and examined by BCCYS employee, Tina Daniels. At that time, Daniels, who had received a report that Travonne was being physically abused by Kevin Brown, observed multiple bruises on Travonne's upper rear thighs. According to the Browns, Daniels then contacted them at work, advised them that Travonne had been placed with his maternal grandmother pursuant to Pennsylvania state law, and that they should "stay away" from Travonne until the completion of her investigation. Approximately one week later, Daniels notified the Browns in writing of the alleged physical abuse report. It is unclear from the record what transpired until July 9, 2003, when a Juvenile Court hearing was conducted. At the July 9 hearing, the Juvenile Court directed the family to begin counseling, and ordered Travonne to "remain in residence with his grandmother under protective supervision of [BCCYS]."

On August 11, 2003, the Browns filed the underlying complaint in the District Court for the Eastern District of Pennsylvania. The Browns alleged that Daniels, Supervisor **[\*\*3]** Brandy Neider and BCCYS (collectively, "the appellees") violated their substantive due process rights by examining Travonne; notifying Kevin Brown's employer of the abuse allegations; and harassing them "during the healing process." The Browns further alleged that the appellees violated their procedural due process rights by removing Travonne from their home without a court order or hearings as required by Pennsylvania law. n1 The Browns sought punitive and compensatory damages for their "mental anguish and physical suffering." The appellees filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). n2 On August 13, 2004, the District Court granted the motion to dismiss, determining that the Browns had failed to state a claim alleging violations of their due process rights or of the Child Protective Services Law, 23 Pa.C.S.A. § 6301 et seq., and that, in any event, the appellees were entitled to qualified immunity. This timely appeal followed.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 In their complaint, the Browns vaguely alleged that their other minor child, Trista Lynn Wilson, was "ordered to stay with" the maternal grandmother in an "unsafe environment." The Browns failed to elaborate factually or legally on this claim either in the District Court or on appeal. Such ^**HN1** conclusory allegations are simply insufficient to state a claim. See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997) (stating that ^**HN2** "a court need not credit a complaint's bald assertions or legal conclusions when deciding on a motion to dismiss") (internal quotations omitted). Accordingly, the District Court properly dismissed the Browns' claims to the extent that they related to Trista. **[\*\*4]**

n2 Thereafter, the appellants filed a motion for leave to amend their complaint, seeking to add as defendants: juvenile court judge, Maryann Campbell; court-appointed expert, Thomas G. Baker, Ph.D.; and BCCYS caseworker, James Trump. On February 26, 2004, the District Court denied in part and dismissed without prejudice in part the appellants' motion to amend. The appellants neither challenge this ruling on appeal, nor have they provided any factual or legal support for claims against these putative defendants.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

^**HN3** Our standard of review of the District Court's dismissal under Rule 12(b)(6) is plenary. See Gallo v. City of Philadelphia, 161 F.3d 217, 221 (3d Cir. 1998). "We must determine whether, under any reasonable reading of the pleadings, the **[\*913]** plaintiffs may be

entitled to relief, and we must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).

The Browns challenge two of the District Court's procedural rulings on appeal. First, the Browns argue that [**5] the District Court erred in considering materials outside of the pleadings when it granted the appellees' motion to dismiss. HN4 "In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of America, 361 F.3d 217, 222 n. 3 (3d Cir. 2004); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (explaining that a document forms the basis of a claim if it is "integral to or explicitly relied upon in the complaint"). Here, the Browns attached to their reply to the appellees' motion to dismiss a number of documents, including pleadings and orders filed in the Court of Common Pleas of Berks County. In granting the appellees' motion to dismiss, the District Court relied upon several of the Browns' documents. However, the District Court only relied upon those documents which are a matter of public record or were integral to the Browns' claims. Moreover, the District Court's consideration of the documents was not unfair to the Browns [**6] because, by themselves relying upon the documents, the Browns were on notice that they would be considered. See id. Under these circumstances, we conclude that the District Court did not improperly rely upon documents submitted by the Browns. Second, the Browns argue that the District Court improperly granted the appellees' motion to dismiss without first requiring the appellees to file an answer to their complaint. HN5 A Rule 12(b)(6) defense for failure to state a claim may be raised in a pre-answer motion. See Fed. R. Civ. P. 12(b). HN6 "If the court denies the motion, . . . the [answer must] be served within 10 days after notice of the court's action." Fed. R. Civ. P. 12(a)(4)(A). HN7 If, however, the District Court grants the motion, as it did here, the plaintiff's action is dismissed and an answer is no longer required. Accordingly, because the District Court granted the appellees' motion to dismiss, the appellees were not required to file an answer to the Browns' complaint.

Turning to the merits of the complaint, we will affirm the District Court's dismissal of the Browns' claims against Neider and [**7] the BCCYS, although for different reasons than those provided by the District Court. See Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000) (en banc) (concluding that HN8 we may affirm the District Court on any grounds supported by the record). The Browns' complaint contains no allegation of Neider's involvement in the alleged constitutional violations, but rather attempts to hold her responsible merely because of her supervisory position within the BCCYS. It is well-established, however, that HN9 liability in a § 1983 action must be predicated upon personal involvement, not on the basis of respondeat superior. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998). Likewise, in order to establish liability on the part of the BCCYS, the Browns would have to show that it had an established policy or custom that resulted in the alleged constitutional violations. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). The Browns' complaint failed to identify any such customs or policies.

The District Court also did not err in dismissing the Browns' claims that Daniels [*914] violated their rights by [**8] examining Travonne for bruises, notifying Kevin Brown's employer of the abuse allegations, and harassing them "during the healing process." HN10 Parents have a liberty interest in the care, custody, and management of their children. See Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997). "This interest, however, must be balanced against the state's interest in protecting children suspected of being abused." Miller v. City of Philadelphia, 174 F.3d 368, 373 (3d Cir. 1999); see also Croft, 103 F.3d at 1125 ("The right to familial integrity, in other words, does not include a right to remain free from child abuse allegations."). "In cases like this, where abusive action by a member of the executive branch is alleged, 'only the most egregious

official conduct can be said to be arbitrary in the constitutional sense.'" Miller, 174 F.3d at 375 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998) (citation and internal quotation marks omitted)). Thus, to generate liability, the executive action alleged must be so "ill-conceived or malicious, **[**9]** " Miller, 174 F.3d at 375, that it "shocks the conscience." Lewis, 523 U.S. at 846.

Even if all of the facts alleged by the Browns are true, Daniels did not act in a way that shocks the conscience. The Browns do not dispute that Daniels received a report that Travonne was being physically abused by Kevin Brown, or that Travonne told Daniels that he was afraid to return home. Likewise, the Browns do not dispute that Travonne had bruising on his thighs consistent with repeatedly being hit with a belt. Under these circumstances, where Daniels had a reasonable belief that Travonne was in danger, she did not act in a way that shocks the conscience by viewing Travonne's upper thighs. Moreover, we agree with the District Court that while notifying Kevin Brown's employer about her investigation may have been "ill-advised or an exercise in poor judgment," Daniels' alleged actions do not rise to the level of a due process violation. Additionally, the Browns' conclusory allegations of harassment by Daniels "during the healing process" are insufficient to state a claim. See Morse, 132 F.3d at 906 (3d Cir. 1997).

The Browns also alleged that Daniels **[**10]** violated their procedural due process rights when she took Travonne into custody on May 21, 2003, without: (1) obtaining a court order; (2) notifying them in writing within 24 hours of his whereabouts; and (3) conducting an informal hearing within 72 hours, all in violation of state law. See 42 Pa.C.S.A. § 6324 (providing methods for taking child into custody) and § 6332 (requiring an informal hearing within 72 hours of the child's placement in protective custody); 23 Pa.C.S.A. § 6315(b) (providing that no child may be held in protective custody for more than 24 hours without a court order) and § 6315(c) (providing for parental notification within 24 hours of child's whereabouts). The Browns do not challenge the constitutionality of the Pennsylvania laws governing protective custody. However, they do claim that by failing to comply with the procedures required by state law, especially with regard to the 72 hour limit for holding a post-deprivation informal hearing, Daniels violated their procedural due process rights. See, e.g., Miller, 174 F.3d at 372-374; Patterson v. Armstrong Cty. Children & Youth Services, 141 F. Supp. 2d 512, 531-540 (W.D. Pa. 2001). **[**11]**

It is well-settled that *HN11* "in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or an order of the court." Hollingsworth v. Hill, 110 F.3d 733, 739 **[*915]** (10th Cir. 1997). However, "in those extra-ordinary situations where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed." Suboh v. District Attorney's Office of Suffolk, 298 F.3d 81, 92 (1st Cir. 2002). Thus, "when the state removes a child from [his] parents, due process guarantees prompt and fair post-deprivation judicial review." Berman v. Young, 291 F.3d 976, 985 (7th Cir. 2002); see also Miller, 174 F.3d at 372 n. 4; Jordan v. Jackson, 15 F.3d 333, 343 (4th Cir. 1994) (noting that *HN12* "the requirements of due process may be delayed where emergency action is necessary to avert imminent harm to a child, provided that post-deprivation process to ratify the emergency action is promptly accorded") (internal **[**12]** citations omitted).

*HN13* Although there is no bright-line rule for deciding whether a post-deprivation hearing is sufficiently "prompt," the delay should ordinarily be measured in hours and days, as opposed to weeks. See Tower v. Leslie-Brown, 326 F.3d 290, 299 (1st Cir. 2003) (approving a post-deprivation hearing that occurred three days after children were removed from parents' home where child protective worker sought ex parte review of the removal decision within hours of the removal); Berman, 291 F.3d at 985 (concluding that a 72-day delay in the proceedings was "rather outrageous," but finding no actual damages resulting from the delay

in the post-deprivation hearing); Whisman v. Rinehart, 119 F.3d 1303, 1310 (8th Cir. 1997) (concluding that under the facts before it, a hearing held 17 days after the state had taken custody was not "prompt"); Jordan, 15 F.3d at 351 (concluding that a 65-hour delay in judicial review of an emergency removal was constitutionally permissible, but that the 65-hour period was "near, if not at, the outer limit of permissible delay"); Cecere v. City of New York, 967 F.2d 826, 829-30 (2d Cir. 1992) [**13] (approving a 4 day delay); Lossman v. Pekarske, 707 F.2d 288, 290 (7th Cir. 1983) (approving a post-deprivation hearing that occurred 12 days after the state took custody, but noting that the hearing would have taken place earlier had the parents not requested additional time to prepare).

Assuming all of the Browns' allegations to be true, as we must, Travonne was placed in protective custody with his maternal grandmother without a court order on May 21, 2003. However, based upon the sparse record on appeal, it appears that post-deprivation proceedings may not have been conducted until July 9, 2003, approximately seven weeks after Travonne was placed with his maternal grandmother. Without commenting on the ultimate merits of the claim, we conclude that, on this record, the Browns sufficiently alleged a violation of their procedural due process rights against Daniels.

Finally, on this record we cannot conclude that Daniels is entitled to the defense of qualified immunity. *HN14* Although qualified immunity is an affirmative defense, "a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense appears on its face. Thus, qualified immunity will [**14] be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001) (quotations and citations omitted). *HN15* Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional laws of which a reasonable person would have known." Harlow v. Fitzgerald, [*916] 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). A right may be clearly established even if there is no "previous precedent directly in point." Good v. Dauphin County Soc. Servs. for Children & Youth, 891 F.2d 1087, 1092 (3d Cir. 1989) (denying qualified immunity and citing case law from other jurisdictions). "The ultimate issue is whether . . . reasonable officials in the defendants' position at the relevant time could have believed that, in light of what was in the decided case law, that their conduct would be lawful." Id. Accepting the allegations in the complaint as true and drawing all inferences in the Browns' favor, a reasonable [**15] BCCYS employee could not have believed that a post-deprivation hearing conducted seven weeks after the removal of a child from his parents' home complied with due process. See, e.g., Miller, 174 F.3d at 372 n. 4 (explaining that initiating child custody proceedings by ex parte order is generally constitutional *if* a prompt post-deprivation hearing is held, and noting Pennsylvania's 72 hour requirement); see also Patterson, 141 F. Supp. 2d at 540-42 (rejecting qualified immunity defense where defendants failed to provide plaintiffs with a prompt and adequate judicial hearing within 72 hours of taking child into protective custody).

Accordingly, we will vacate the District Court's August 13, 2004, judgment as to the Browns' procedural due process claim against Daniels. We will affirm the District Court's judgment in favor of all the appellees as to the remainder of the claims.

Service:    **Get by LEXSEE®**
Citation:   **128 fed. appx. 910**
View:       Full
Date/Time:  Friday, January 12, 2007 - 1:08 PM EST

\* Signal Legend:

● - Warning: Negative treatment is indicated

Ⓠ - Questioned: Validity questioned by citing refs

⚠ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
Ⓘ -  Citation information available

\* Click on any *Shepard's* signal to *Shepardize*® that case.

 **LexisNexis**®

About LexisNexis  | Terms & Conditions
Copyright ©  2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document by Citation 1989 Del. Super. LEXIS 450    Page 1 of 7

Case 1:06-cv-00499-GMS    Document 7-5    Filed 01/12/2007    Page 1 of 7

Service: **Get by LEXSEE®**
Citation: **1989 del. super. lexis 450**  📖 -View MDWCG Results (1)

*1989 Del. Super. LEXIS 450, * 📖*

HERMAN N. RIZZO and JEAN L. RIZZO, Plaintiffs, v. E. I. DU PONT DE NEMOURS & CO., a Delaware corporation; DU PONT COUNTRY CLUB, a Delaware corporation; ROBERT POTTER; EARL SHAFER; and J. DANNY PRILLAMAN, Defendants

C.A. No. 86C-JL-88

Superior Court of Delaware, New Castle

1989 Del. Super. LEXIS 450

Submitted: August 8, 1988
October 31, 1989, Decided

**PRIOR HISTORY:  [*1]**

Upon defendants' motion for summary judgment as to the two counts of tortious interference. GRANTED. Upon defendants' motion for summary judgment based on lack of physical injury to the plaintiff. GRANTED. Upon defendants' motion for summary judgment for Mrs. Rizzo's claim for loss of consortium. GRANTED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs, employee and his wife, filed an action against defendants, employer and associated individuals, for tortious interference with prospective advantage, tortious interference with employment, intentional infliction of emotional distress, and loss of consortium. Defendants filed a motion for summary judgment.

**OVERVIEW:** The employee worked for the employer for 17 years as a grounds keeper, after which he elected early retirement and retired. The employee claimed that defendants' mistreatment of him forced him to retire early thereby reducing his retirement benefits. Thus, plaintiffs filed an action against defendants for tortious interference with prospective advantage, tortious interference with employment, intentional infliction of emotional distress, and loss of consortium. The court granted defendants' motion for summary judgment on all claims. The court found that the employee's claims for tortious interference were based on the employer's alleged violations of its own policies, which the court found did not give rise to a cause of action for the employee as he was an at-will employee. The court also found that the employee could not recover for intentional infliction of emotional distress because he did not suffer a physical injury. Finally, the court found that the employee's wife failed to state a claim for loss of consortium because that claim was derivative of the emotional distress claim, which the court had found was precluded.

**OUTCOME:** The court granted defendants' motion for summary judgment.

**CORE TERMS:** at-will, summary judgment, physical injury, intentional infliction of emotional distress, tortious interference, supervisor, personal injury, Workmen's Compensation Act, loss of consortium, exclusive remedy, compensable, termination, Delaware Workmen's Compensation Act, worker's compensation, emotional distress, discharged, derivative, polygraph, overtime, failure to state a claim, workers' compensation, mental distress, cause of action, bodily harm, dispositive, claimant, infliction of emotional distress, early retirement,

Get a Document - by Citation - 1989 Del. Super. LEXIS 450

Case 1:06-cv-00499-GMS   Document 15   Filed 01/12/2007   Page 2 of 7

Page 2 of 7

non-physical, animosity

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment 

Labor & Employment Law > Employment Relationships > At-Will Employment > Exceptions > General Overview 

**HN1** Under the employment at-will doctrine, either party has the right to end employment at any time and no cause for termination needs to be alleged or proved. Because no cause for termination needs to be shown, a cause of action is not generally available to show that termination was improper. Delaware recognized the doctrine of at-will employment with few exceptions. More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment > Exceptions > General Overview 

**HN2** Except for situations of contractual modifications or statutory exceptions, Delaware upholds the employment at-will doctrine. More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview 

Labor & Employment Law > Wrongful Termination

**HN3** Claims based on company policies do not give rise to a cause of action for an employee at-will, who is terminated. More Like This Headnote |
*Sheapardize*: Restrict By Headnote

Workers' Compensation & SSDI > Compensability > Injuries > Accidental Injuries 

Workers' Compensation & SSDI > Compensability > Injuries > Psychological Injuries 

Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > General Overview 

**HN4** The Workmen's Compensation Act provides that every employer shall compensate for personal injury or death by accident arising out of and in the course of employment. Del. Code Ann. tit. 19, § 2304 *Sheapardize*  . The terms "injury" and "personal injury" are defined as violence to the physical structure of the body. Del. Code Ann. tit. 19, § 2301(12) *Sheapardize*  . While emotional distress is not specifically included in the codified definition, Delaware courts conclude that emotional distress is encompassed by the term "personal injury." More Like This Headnote

Civil Procedure > Discovery > Methods > General Overview

Workers' Compensation & SSDI > Compensability > Injuries > Psychological Injuries

Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity

**HN5** Mental injuries are compensable under the Workmen's Compensation Act. The Delaware Workmen's Compensation Act bars any action by an employee against his employer for a work-related physical injury. Physical and mental injuries that would otherwise be compensable in workers' compensation are recoverable in connection with a non-physical tort action only if they are items of damage peripheral or incidental to the physical tort. Claims for actions which precede and help produce an injury are barred because they merge into the injury for which a worker's

Get a Document by Citation 1989 Del. Super. LEXIS 450

Case 1:06-cv-00499-GMS   Document 7-5   Filed 01/12/2007   Page 3 of 7   Page 3 of 7

compensation remedy is available. More Like This Headnote | *Sheperdize:* Restrict By Headnote

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements 

*HN6* Regardless of the legal theory used in pursuing a claim for intentional infliction of emotional distress, the claimant must show a physical injury to sustain the claim. More Like This Headnote | *Sheperdize:* Restrict By Headnote

Family Law > Marital Duties & Rights > Causes of Action > Loss of Consortium 

Torts > Damages > Consortium Damages > Spouses 

Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > General Overview

*HN7* To the extent that workmen's compensation provides an exclusive remedy for the employee's claim for personal injury, it presents an equal bar to a spouse's claim on which it is dependent. More Like This Headnote

**COUNSEL:** Ruth M. Ferrell, Esquire, Wilmington, Delaware for the plaintiffs.

Richard D. Allen, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware for the defendants.

**JUDGES:** Before GEBELEIN, Judge

**OPINION BY:** GEBELEIN

**OPINION:** MEMORANDUM OPINION

GEBELEIN, JUDGE

Plaintiff, Herman Rizzo, was an at-will employee of the DuPont Country Club, as a grounds keeper for approximately 17 years. On April 30, 1985, Mr. Rizzo retired from the DuPont Country Club under its early retirement plan, which provided that employees who retired early would receive an additional five years of service credit and five years of age credit in calculating pension benefits.

Mr. Rizzo sued his employer and his supervisors, alleging that their mistreatment of him forced him to retire early, resulting in reduced retirement benefits. The 14-count complaint included two federal claims under the Employee Retirement Income Security Act **[*2]** of 1974 ("ERISA") and various state claims. Because of the federal claims, the defendants moved the case to the District Court of Delaware.

During that proceeding, Mr. Rizzo amended his complaint to include Mrs. Rizzo as a plaintiff and E. I. du Pont de Nemours & Co. as a defendant. After the claims were consolidated, the final complaint alleged two violations of the federal ERISA statute and four state law claims. The District Court granted the defendants' motion for summary judgment on the two federal claims and remanded the four state claims to this Court. Those claims are: (1) tortious interference with prospective advantage, (2) tortious interference with employment, (3) intentional infliction of emotional distress and (4) loss of consortium.

The defendants moved for summary judgment alleging that the counts of tortious interference are not a recognized claim upon which relief can be granted because Delaware continues to recognize the doctrine of at-will employment; that the claim of intentional

Get a Document - by Citation - 1989 Del. Super. LEXIS 450    Page 4 of 7

Case 1:06-cv-00499-GMS   Document 7-5   Filed 01/12/2007   Page 4 of 7

inflication of emotional distress has its exclusive remedy in the Delaware Workmen's Compensation Act; and because the claim of loss of consortium is derivative of the intentional **[\*3]** inflication of emotional distress claim, it must also be dismissed.

*HN1* Under the employment at-will doctrine, either party has the right to end employment at any time and no cause for termination needs to be alleged or proved. Greer v. Arlington Mills Mfg. Co., Del. Super., 43 A. 609 (1899). Because no cause for termination needs to be shown, a cause of action is not generally available to show that termination was improper. Delaware has continuously recognized the doctrine of at-will employment. Greer, supra; Drake v. Hercules Powder Co., Del, Super., 55 A.2d 630 (1946); Haney v. Laub, Del. Super., 312 A.2d 330 (1973); Heideck v. Kent General Hospital, Inc., Del. Super., 446 A.2d 1095 (1982); Emory v. Nanticoke Homes, Inc., Del. Super., C.A. No. 82C-MR-14, Ridgely, J. (July 19, 1985); Heller v. Dover Warehouse, Inc., Del. Super., 515 A.2d 178 (1986); Irvine v. Potts Welding and Boiler Repair Co., D. Del., C.A. No. 87-518- JJF, Farnan, J. (Sept. 14, 1988).

The plaintiffs, who do not dispute that Mr. Rizzo's employment was at-will, ask this Court to recognize **[\*4]** an exception to the at-will doctrine and allow the claims of tortious interference.

Delaware has recognized few exceptions to the at-will doctrine. In Haney, the Court recognized the continued vitality of at-will employment, but denied the defendant's motion for summary judgment because the plaintiff's at-will employment was modified by a subsequent agreement which gave the employee stock option rights unless he was discharged for cause. In Heller, the Court also said the doctrine of at-will employment retained its vitality, but because an anti-polygraph statute prohibited employers from forcing employees to take a polygraph as a condition of continued employment and the employer directed the employee to take a polygraph, the Court found that the statute created an exception to the at-will doctrine.

*HN2* Except for situations of contractual modifications or statutory exceptions, Delaware has upheld the employment at-will doctrine. In Heideck, the Supreme Court of Delaware affirmed summary judgment for the defendant where the plaintiff claimed that the employer's handbook of company policies modified her at-will status. Similarly, in Emory, the defendant was granted summary **[\*5]** judgment where the at-will employee claimed he was discharged in contravention of discipline policies and procedures set forth in the defendant's handbook. The Court refused to recognize a public policy exception that would allow the plaintiff's claim that he was discharged so that the defendant could avoid future worker's compensation claims or the claim that he was wrongfully discharged in retaliation for filing worker's compensation claims and for union activities.

The Court noted that the General Assembly has enacted specific legislation prohibiting the discharge of at-will employees in certain contexts, such as jury duty, polygraph tests, etc. at 8. The Court concluded that creation of a new cause of action raised policy concerns which require legislative consideration and that the proper balance between the right to contract and the employee's rights should be struck by the legislature.

Mr. Rizzo, like the plaintiffs in Heideck and Emory, claims that the defendants disregarded their stated policies of promotion, work assignments, overtime work and detail pay jobs. He attributes part of this disregard of policies to the fact that there was animosity between him and his supervisor. **[\*6]** He alleges that this animosity and disregard of policies forced him to take early retirement, causing him to lose future earnings, pension payments, social security payments and fringe benefits.

Looking at the facts in a light most favorable to the plaintiffs and assuming these facts are

true, this Court must still follow Delaware law. The Supreme Court of Delaware has concluded that *HN3* claims based on company policies do not give rise to a cause of action for an employee at-will, who is terminated. Thus, the defendants' motion for summary judgment is GRANTED as to the two counts of tortious interference. n1

n1 This Court also notes that Mr. Rizzo's own deposition states that the transfer from one golf course to another was not uncommon; that his supervisor was in a position to observe him and reprimanded him for talking too much (he conceded that he sometimes talked too much); that he does not dispute the bases for the three probations imposed on him; that the amount of overtime he received was on par with other grounds keepers; that there were opportunities for overtime for which he did not request consideration; that he thought that based on his seniority he should be assigned only those tasks he enjoyed the most; and that when he told his supervisors that he was unable to perform steam cleaning jobs he was taken off the job. Based on these noted facts, the Court concludes that Mr. Rizzo's claim factually asserts only that he and his supervisor did not get along. Thus, even if Delaware did recognize the exceptions of tortious interference, the facts do not support a claim. **[*7]**

The defendants also move for summary judgment stating that Mr. Rizzo's claim for intentional infliction of emotional distress is not a valid cause of action because his exclusive remedy for such a claim is the Delaware Workmen's Compensation Act, 19 Del. C. § 2304*Shepardize* .

*HN4* The Workmen's Compensation Act provides that every employer shall compensate for personal injury or death by accident arising out of and in the course of employment. 19 Del. C. § 2304*Shepardize* . The terms "injury" and "personal injury" are defined as "violence to the physical structure of the body . . . ." 19 Del. C. § 2301(12)*Shepardize* . While emotional distress is not specifically included in the codified definition, Delaware courts have interpreted the term "personal injury" and concluded that emotional distress is encompassed by the term. Battista v. Chrysler Corp., Del. Super., 454 A.2d 286 (1982) (finding that personal injury included mental distress and granting the defendants' motion to dismiss for failure to state a claim because the workers' compensation act was the employee's exclusive remedy for claims against the employer for intentional infliction of mental distress.)

The Supreme Court of Delaware **[*8]** has also held that *HN5* mental injuries are compensable under the Workmen's Compensation Act. See, Ramey v. Delaware Materials, Inc., Del. Supr., 399 A.2d 205 (1979); Mergenthaler v. Asbestos Corp. of America, Del. Supr., 480 A.2d 647, 650 (1984).

In Mergenthaler, the Supreme Court of Delaware recognized that it is settled law that the Delaware Workmen's Compensation Act bars any action by an employee against his employer for a work-related physical injury. It said that physical and mental injuries that would otherwise be compensable in workers' compensation are recoverable in connection with a non-physical tort action only if they are items of damage peripheral or incidental to the physical tort. As examples of non-physical torts, the Court cited defamation cases because there is a proprietary interest, personal property damage cases, and actions such as fraud that occurred after the injury.

The Court held that claims for actions which precede and help produce an injury are barred because they merge into the injury for which a worker's compensation remedy is available.

Here the defendant claims the injury of emotional distress, which the courts **[*9]** have held may be compensable under the Workmen's Compensation Act. The claimed injury occurred due to the alleged course of conduct of the employer and its supervisors, as recited above.

Get a Document - by Citation - 1989 Del. Super. LEXIS 450    Page 6 of 7

Case 1:06-cv-00499-GMS    Document 75    Filed 01/12/2007    Page 6 of 7

Because the conduct preceded and produced the injury, it merges into the injury for which compensation may be provided under the Workmen's Compensation Act.

This Court also notes that *HN6* regardless of the legal theory used in pursuing a claim for intentional infliction of emotional distress, the claimant must show a physical injury to sustain the claim. Mergenthaler, supra at 651 △⚖ (in any claim for mental anguish an essential element of the claim is that the claimant have a present physical injury and plaintiff's concession of no physical injury is dispositive of the claim); McKnight v. Voshell, Del. Supr., 513 A.2d 1319 (1986)*Shepardize* ⚖ (unreported Order) (affirming Superior Court dismissal of plaintiff's claim for intentional infliction of emotional distress for failure to state a claim because a claim of infliction of emotional distress requires a present injury of bodily harm).

The plaintiffs here suffered no bodily harm, but rather they argue that current Delaware law **[*10]** is that a claim of intentional infliction of emotional distress does not require physical injury. The plaintiffs rely on a Superior Court decision, Mattern v. Hudson, Del. Super., 532 A.2d 85 (1987).◆⚖ In Mattern, the Court said that no Delaware Court has had the opportunity to adopt the tort of intentional infliction of emotional distress. However, in the unreported McKnight decision the Supreme Court of Delaware did conclude that a physical injury is necessary to sustain the action. See also, Mergenthaler, supra.△⚖ Because the plaintiffs present no facts of a physical injury, it is dispositive of the claim and summary judgment for the defendants is GRANTED.

The defendants move for summary judgment on Mrs. Rizzo's loss of consortium claim against the employer because it is solely derivative of Mr. Rizzo's claim and because that claim is precluded, Mrs. Rizzo's claim is also.

*HN7* To the extent that workmen's compensation provides an exclusive remedy for the employee's claim for personal injury, it presents an equal bar to a spouse's claim on which it is dependent. Nutt v. A.C. & S., Inc., Dell Super., 466 A.2d 18 (1983)◆⚖ **[*11]** (aff'd sub. nom Mergenthaler v. Asbestos Corp. of America, Del. Supr., 480 A.2d 647 (1984).△⚖ The wife's claim for loss of consortium is a derivative one and must stand on the merits of her husband's entitlement to sue. Nutt, supra;◆⚖ Farrall v. Armstrong Cork Co., Del. Super., 457 A.2d 763 (1983).△⚖

This Court has concluded that Mr. Rizzo's remedy, if available at all, was exclusively provided by the Workmen's Compensation Act. Additionally, the law requires that Mr. Rizzo demonstrate a physical injury for his claim to be recognized. Mr. Rizzo presents no facts that demonstrate a physical injury and Mrs. Rizzo may recover damages only if her husband's claim for physical injury is a valid one. Therefore, the defendants' motion for summary judgment for Mrs. Rizzo's claim for loss of consortium is GRANTED.

IT IS SO ORDERED.

Service: **Get by LEXSEE®**
Citation: **1989 del. super. lexis 450** ⚖ -View MDWCG Results (1)
View: Full
Date/Time: Friday, January 12, 2007 - 1:08 PM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
△ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available

Get a Document - by Citation - 1989 Del. Super. LEXIS 450    Page 7 of 7

Case 1:06-cv-00499-GMS    Document 7-5    Filed 01/12/2007    Page 7 of 7

 -   Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

**LexisNexis**®    About LexisNexis  | Terms & Conditions
Copyright ©  2007 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

Get a Document - by Citation - 2003 Del. Super. LEXIS 437

Case 1:06-cv-00499-GMS    Document 7-8    Filed 01/12/2007    Page 1 of 8    Page 1 of 8

Service: **Get by LEXSEE®**
Citation: **2003 del. super. lexis 437** 📖 -View MDWCG Results (1)

*2003 Del. Super. LEXIS 437, * 📖

**MARK BEATTY AND MARY BEATTY, husband and wife, Plaintiffs, v. DEBORAH SMEDLEY, Defendant, v. MARK BEATTY, Counterclaim Defendant.**

C.A. No. 00C-06-060-JRS

SUPERIOR COURT OF DELAWARE, NEW CASTLE

2003 Del. Super. LEXIS 437

December 23, 2002, Submitted
March 12, 2003, Decided

**DISPOSITION:** [*1] Plaintiffs' motion for reargument denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs, husband and wife, filed a motion for reargument after a jury returned a verdict in favor of defendant in their personal injury action and the court denied plaintiffs' motion for a new trial.

**OVERVIEW:** Plaintiffs sued defendant for personal injuries sustained by the wife. The jury found that defendant's negligence did not proximately cause injury to the wife. The court denied plaintiffs' motion for a new trial, holding that even though their medical experts opined that the wife exhibited objective signs of injury, the jury, nevertheless, could have rejected that testimony because defendant had demonstrated that the expert opinions were not based on reliable information. Plaintiffs then filed a motion for reargument. The court denied the motion, finding that the testimony at trial revealed that neither of plaintiffs' experts had been made aware of the extent of the wife's pre-existing neck injury prior to reaching their opinions and that when confronted with the medical records depicting a prior injury, they refused to acknowledge that the pre-existing injury was in any way significant. The court concluded that a jury could reject a medical expert's opinions regarding objective signs of injury when defense counsel raised legitimate questions regarding the expert's credibility during cross examination and through other evidence presented at trial.

**OUTCOME:** The court denied the motion.

**CORE TERMS:** credibility, credible, new trial, pre-existing, cross examination, reargument, expert testimony, uncontradicted, defense counsel, misapprehended, unrebutted, finds support, post-trial, personal injuries, permanent injury, expert witness, conscience, confronted, reliable, weighing, patients, doctors, opined, neck

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

Civil Procedure > Judgments > Relief From Judgment > General Overview 📄

Governments > Courts > Judicial Precedents 📄

*HN1* ⚓ A motion for reargument is the proper device for seeking reconsideration by the trial

Get a Document - by Citation - 2003 Del. Super. LEXIS 437

Case 1:06-cv-00499-GMS    Document 7-6    Filed 01/12/2007    Page 2 of 8

Page 2 of 8

court of its findings of fact, conclusions of law, or judgment. The manifest purpose of all Del. Super. Ct. R. 59 motions is to afford the trial court an opportunity to correct errors prior to appeal. A motion for reargument is not a device for raising new arguments or stringing out the length of time for making an argument. It will be denied unless the court has overlooked a controlling precedent or legal principles, or the court has misapprehended the law or facts such as would have changed the outcome of the underlying decision. More Like This Headnote |
*Shepardize:* Restrict By Headnote

Civil Procedure > Trials > Jury Trials > Jury Instructions > Objections to Instructions 

Evidence > Testimony > Credibility > General Overview

Evidence > Testimony > Experts > Credibility > General Overview

*HN2* In trials by jury, the jurors, not the judge, determine when a witness -- including an expert witness -- is credible and when the witness is not credible. More Like This Headnote

**COUNSEL:** Donald E. Evans, Esquire, EVANS & ASSOCIATES, Wilmington, Delaware, Attorney for the Plaintiffs.

Edward F. Kafader, Esquire, FERRY, JOSEPH & PEARCE, Wilmington, Delaware, Attorney for the Defendant.

Thomas P. Leff, Esquire, CASARINO, CHRISTMAN & SHALK, Wilmington, Delaware, Attorney for the Counterclaim Defendant.

**JUDGES:** Judge Joseph R. Slights, III.

**OPINION BY:** Joseph R. Slights, III

**OPINION: MEMORANDUM OPINION**

**SLIGHTS, J.**

*Facts*

The jury in this personal injury case returned a verdict in favor of the defendant, Deborah Smedley, after finding that her negligence did not proximately cause injury to the plaintiff, Mary Beatty. n1 On July 12, 2002, the Court, by oral ruling, denied plaintiffs' motion for new trial. The Court held that even though the plaintiffs' medical experts opined that plaintiff exhibited objective signs of injury, the jury, nevertheless, could have rejected that testimony because the defendant had demonstrated that the expert opinions were not based on reliable information. The Court concluded, in other words, that even though the opinions were unrebutted by defense expert testimony, **[*2]** the jury could reject the plaintiff's experts' opinions if it had a reasonable basis to conclude the opinions were not reliable or credible.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


n1 The plaintiffs are Mary Beatty and her husband, Mark Beatty. Mrs. Beatty made the claim for personal injuries; her husband alleged a derivative loss of consortium claim. The Court will refer only to Mrs. Beatty's claims when referring hereinafter to "plaintiff."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The testimony at trial revealed that neither of plaintiff's experts had been made aware of the full extent of her pre-existing neck injury prior to reaching their opinions that her neck injury was caused by this accident. Once confronted during trial with the medical records depicting the prior injury, including records which recorded prior objective signs of injury similar to those encountered by the doctors after this accident, the experts refused to acknowledge that the pre-existing injury was in any way significant. In the context of this record, the Court determined that the jury may well have perceived that **[*3]** "the experts were taking the stand without complete information [and], after having committed themselves to a position, they refused to acknowledge the potential importance of the additional information." n2

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 D.I. 62, Transcript of Court's Ruling on Plaintiffs' Motion for New Trial, at 3 (July 12, 2002).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In addition to forming opinions with less than a complete foundation, the experts also offered arguably incredible excuses for the plaintiff's failure to disclose her pre-existing injuries to her doctors when she first sought treatment from them. When confronted with forms completed in the plaintiff's own hand, in which she clearly denied pre-existing injuries, both experts attempted to justify her failure to acknowledge pre-existing injuries by characterizing the questions on the forms as complicated when they were not and by explaining that patients often fail to focus when providing medical history. The jury readily could have concluded that these explanations were not credible. n3

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 In essence, plaintiff's experts explained that it is common for patients not to focus on their answers to medical questionnaires or to misunderstand what is being asked of them on the forms. Defense counsel argued to the jury in closing that in view of the very clear questions on the form and the importance of the history-taking process, the experts' explanations for plaintiff's contradictory responses on the form were not reasonable.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*4]**

Finally, the jury watched as one of the plaintiff's experts was forced to concede during cross examination that one of his pretrial opinions was not well founded. Dr. Banderas initially opined that the plaintiff had suffered a permanent injury to her low back as a result of this accident. On cross examination, upon learning that the plaintiff had not experienced any symptoms in her low back for some time, Dr. Banderas had no choice but to acknowledge that his previous opinion was wrong.

In denying the motion for new trial, the Court determined that by the time the evidence closed, the jury reasonably could have concluded that the plaintiff's experts had rendered their opinions with less than complete information and that one of the experts had overstated his opinion with respect to the extent of the injuries caused by the accident. Under these

Get a Document - by Citation - 2003 Del. Super. LEXIS 437

Case 1:06-cv-00499-GMS    Document 11-8    Filed 01/12/2007    Page 4 of 8    Page 4 of 8

circumstances, it was quite reasonable for the jury to question the accuracy and/or objectivity of the expert's opinions.

Plaintiffs have moved for reargument on the grounds that: (1) the Court misapprehended the extent of the testimony regarding objective signs of injury in this case and (2) the Court misapprehended the extent to which it **[*5]** may sanction a defense verdict when the jury has found that the defendant was negligent and has heard unrebutted evidence of objective signs of injury caused by the accident. After reviewing the parties' submissions and more thoroughly reviewing the trial record, the Court remains convinced that a jury may reject a medical expert's opinions regarding objective signs of injury when defense counsel has raised legitimate questions regarding the expert's credibility during cross examination and through other evidence presented at trial. Accordingly, the motion for reargument is **DENIED.**

### Standard of Review

*HN1* "A motion for reargument is the proper device for seeking reconsideration by the Trial Court of its findings of fact, conclusions of law, or judgment... The manifest purpose of all Rule 59 motions is to afford the Trial Court an opportunity to correct errors prior to appeal...." n4 "A motion for reargument is not a device for raising new arguments or stringing out the length of time for making an argument. It will be denied unless the Court has overlooked a controlling precedent or legal principles, or the Court has misapprehended the law or facts such as would have **[*6]** changed the outcome of the underlying decision." n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 *Cummings v. Jimmy's Grille, Inc.,* 2000 Del. Super. LEXIS 252, at *5 ❶ (quoting *Hessler, Inc. v. Farrell,* 260 A.2d 701, 702 (Del. 1969)) ◆🖹 .

n5 *DELJIS v. Gannett Co.,* C.A. No. 01C-01-039, Witham, J. (Del. Super. Jan. 17, 2003) (Mem. Op. at 4) (citations omitted).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

### Discussion

Plaintiffs rely principally upon the Supreme Court of Delaware's decision in *Amalfitano v. Baker, n6* where the Court held that a jury may not reject an uncontradicted expert opinion regarding injury if the opinion is based in part upon objective signs of injury. *Amalfitano* is now oft-cited and well settled. n7 Citing *Amalfitano,* Plaintiffs contend that because their experts were able to support their opinions that the accident caused injury with references to objective signs of injury, including muscle spasms and diagnostic studies revealing abnormal findings, the jury was obliged to accept those opinions absent a credible expert **[*7]** presentation to the contrary on behalf of the defendant.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 794 A.2d 575 (Del. 2001) ⚠🖹 .

n7 *See, e.g., Sullivan v. Sanderson,* 2002 Del. LEXIS 795 at *2-3 (ORDER).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Defendant argues that *Amalfitano* does not go so far as to require a defendant in every case to produce a rebuttal expert in order to challenge the plaintiff's medical expert, even if the expert claims to have detected objected signs of injury. According to defendant, *Amalfitano* allows her to challenge the credibility of plaintiff's experts with effective cross examination alone and, if the effort is successful, the jury may, in turn, justifiably reject the expert's testimony altogether.

Defendant's argument finds support in *Amalfitano* ⚠️📄📑 . There, the Court specifically noted that defense counsel had made no effort to raise a credibility issue with respect to the plaintiff's medical experts. n8 That is not the case here. As noted above, defense counsel cross examined the plaintiff's experts extensively about the **[*8]** fact that they had reached their opinions without complete information regarding the extent of plaintiff's pre-existing injuries, and that at least one of them (Dr. Bandera) seemed willing to jump to conclusions (e.g. the permanent injury to the plaintiff's low back) which eventually proved to be wrong.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 *See Amalfitano, 794 A.2d at 578* ⚠️📄📑 ("Defense counsel failed to raise any credible issue about the motives of or suggesting any bias by the plaintiff's expert witnesses that could taint their testimony about the plaintiff's condition, the independent and objective nature of their examinations and tests or their ultimate conclusions that she suffered injury as a result of the April 1997 accident.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In *Amalfitano* ⚠️📄📑 , the Court concluded that the jury's "zero verdict" could not be upheld because the plaintiff's expert's unrebutted opinion amounted to "'conclusive' evidence of injury that would require a reasonable jury to return a verdict for at least minimal damages." n9 No such "conclusive evidence" **[*9]** of injury was presented in this trial; defense counsel's cross examination of the experts adequately challenged the foundation of their opinions such that the jury was free to question the experts' credibility and, ultimately, to reject their opinions.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 *Id. at 577* ⚠️📄📑 (referring to the standard articulated in *Maier v. Santucci, 697 A.2d 747, 749 (Del. 1997).* ⚠️📄📑 , where the Court held that "uncontradicted medical testimony" supporting a causal link between injury and accident requires an award of some damages).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The jury's verdict here is entirely consistent with its role as judges of the facts (including the credibility of witnesses). As explained in the Court's civil "Pattern Jury Instructions," at §§ 23.9 & 23.10:

> You are the sole judges of each witness' credibility. You should consider each witness' means of knowledge; strength of memory; opportunity to observe; how

reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; **[*10]** the witness' biases, prejudices or interests; the witness' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

***

In weighing expert testimony, you may consider the expert's qualifications, the reason's for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing the testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.

The Court's pattern instructions memorialize a fundamental concept: *HN2* in trials by jury, the jurors, not the judge, determine when a witness -- including an expert witness -- is credible and when the witness is not credible. n10 These pattern instructions were proposed jointly by the parties in this case and read to the jury without objection. n11 In compliance with the Court's instructions, the jury properly exercised its prerogative to reject the testimony of plaintiff's experts in the face of significant evidence undermining their credibility. The Court's conscience **[*11]** is not shocked by this result; the verdict will not be disturbed. n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 *See, e.g., Scullari v. United States,* 2000 U.S. App. LEXIS 3416, at *6-7 (2d Cir. 2000) (the "fact finder is always free to reject, in whole or in part, expert testimony and arrive at an independent conclusion"); *Powers v. Bayliner Marine Corp.,* 83 F.3d 789, 795 (6th Cir. 1995)◆ (in denying plaintiff's motion for new trial and post-trial judgment as a matter of law, the court agreed that the defendant "had raised a question as to the credibility of plaintiffs' expert witness through cross-examination and had offered contrary evidence, and the jury was free to reject plaintiffs' evidence even if it was uncontradicted."); *United States v. Jackson,* 138 U.S. App. D.C. 143, 425 F.2d 574, 577 (D.C. Cir. 1970)◆ (deciding that trial court correctly instructed jury that "the weight, if any, to be given to his expert testimony was exclusively for the jury's determination"); *Harmston v. Agro-West, Inc.,* 111 Idaho 814, 727 P.2d 1242, 1247 (Idaho Ct. App. 1986)◑ ("The credibility and weight of expert testimony, once an expert has been qualified, is exclusively a matter for determination by the jury... An expert's opinion is not binding on the jury and may be rejected even when uncontradicted.") (citations omitted); *75A AM. JUR. 2d Trials § 744^{Shepardize}* (1991) ("The weight to be given to the testimony of an expert or of an interested witness is for the determination of the jury."). Delaware, too, has embraced the jury's exclusive province to determine issues of credibility. *See, e.g., Baylis v. Wilmington Medical Center, Inc.,* 567 A.2d 418, 1989 Del. LEXIS 290, at *3-4 (Del. Supr.)^{Shepardize} (concluding that the jury acted properly by resolving the issues of credibility and conflict among the expert witnesses' testimony); *Savage v. Cooke,* 1995 Del. Super. LEXIS 595, at *1 (in jury trial judge noted that plaintiffs appeared credible to him at trial "but, in a jury case, it is not my factual judgment that is crucial"); *DeAngelis v. Harrison,* 1992 Del. Super. LEXIS 322, at *5◑ ("The jury is free to accept or reject testimony of all witnesses, including experts."). **[*12]**

n11 *See* D.I. 48, at 11.

n12 *See Porter v. Murphy,* C.A. No. 99C-08-258, Cooch, R.J. (Del. Super. Oct. 2, 2001) (Mem. Op. at 3-4) ("A jury's [verdict] is presumed correct and just unless so grossly out of proportion to the injuries suffered as to shock the Court's conscience and sense of justice.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

### Conclusion

This Court previously has observed that motions for new trial have become the norm after parties to personal injury litigation are on the receiving end of jury verdicts which do not meet their expectations. n13 This trend has not been lost on other judges of this Court. n14 Trial judges must resist the temptation to substitute their own judgment for the judgment of the jury when the verdict finds support in the evidence. As Judge Quillen observed: "trials involve risk and those of us involved in the judicial system cannot make litigation risk free. Regardless of how sympathetic the Court may be toward the plaintiff's cause, the Court is not free to ignore the legitimate role of the jury." n15

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n13 *See Dunckle v. Prettyman,* C.A. No. 99C-10-265, Slights, J. (Del. Super. May 1, 2002) (Letter Op. at 8 n. 10) ("Remarkably, this judge has seen a motion for new trial following every jury verdict he has taken over the past 17 months which resolved claims of personal injuries involving disputed damages."). With this case, the trend remains unbroken. **[*13]**

n14 *See, e.g., Hartnett v. Romspert,* 1995 Del. Super. LEXIS 596, at *1 ❶ (Judge Quillen observed: "This Court is bombarded by post-trial motions by disappointed plaintiffs on the issues of weight of evidence and/or damages... What is frustrating is the continuing anticipation that somehow the Court can automatically make real the plaintiff's expectation after a jury has decided to the contrary.").

n15 *Id.*

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Court is satisfied that the jury's verdict in this case was not inconsistent with *Amalfitano* 🄰📧📋 . Instead, it was the product of informed deliberation and reflected the jury's understanding of its obligation to judge the credibility of all witnesses, including experts. Accordingly, plaintiffs' Motion for Reargument must be **DENIED**.

**IT IS SO ORDERED.**

Judge Joseph R. Slights, III

Service: Get by LEXSEE®
Citation: **2003 del. super. lexis 437** 📧📋 -View MDWCG Results (1)

View: Full
Date/Time: Friday, January 12, 2007 - 1:09 PM EST

* Signal Legend:

● - Warning: Negative treatment is indicated

Q - Questioned: Validity questioned by citing refs

⚠ - Caution: Possible negative treatment

◆ - Positive treatment is indicated

A - Citing Refs. With Analysis Available

i - Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

 LexisNexis®

About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: Legal > States Legal - U.S. > Delaware > Restatements & Jurisprudences > Torts > Restatement 2d, Torts - Rule Sections 🔢

TOC: Restatement 2d, Torts - Rule Sections > / . . . / > Topic 3- Liability of Lessors of Land to Persons on the Land > § 357 Where Lessor Contracts to Repair

*Restatement of the Law, Second, Torts, § 357*

Restatement of the Law, Second, Torts
Copyright (c) 1965, The American Law Institute

◆ Case Citations

Rules and Principles

Division 2 - Negligence

Chapter 13 - Liability for Condition and Use of Land

Topic 3 - Liability of Lessors of Land to Persons on the Land

Restat 2d of Torts, § 357

§ 357 Where Lessor Contracts to Repair

**A lessor of land is subject to liability for physical harm caused to his lessee and others upon the land with the consent of the lessee or his sublessee by a condition of disrepair existing before or arising after the lessee has taken possession if**

**(a) the lessor, as such, has contracted by a covenant in the lease or otherwise to keep the land in repair, and**

**(b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented, and**

**(c) the lessor fails to exercise reasonable care to perform his contract.**

Source:  Legal > States Legal - U.S. > Delaware > Restatements & Jurisprudences > Torts > **Restatement 2d, Torts - Rule Sections** 🔢
  TOC:  Restatement 2d, Torts - Rule Sections  > / . . . /  > Topic 3- Liability of Lessors of Land to Persons on the Land  >
        **§ 358 Undisclosed Dangerous Conditions Known to Lessor**

*Restatement of the Law, Second, Torts, § 358*

Restatement of the Law, Second, Torts
Copyright (c) 1965, The American Law Institute

◆ Case Citations

Rules and Principles

Division 2 - Negligence

Chapter 13 - Liability for Condition and Use of Land

Topic 3 - Liability of Lessors of Land to Persons on the Land

Restat 2d of Torts, § 358

§ 358 Undisclosed Dangerous Conditions Known to Lessor

**(1) A lessor of land who conceals or fails to disclose to his lessee any condition, whether natural or artificial, which involves unreasonable risk of physical harm to persons on the land, is subject to liability to the lessee and others upon the land with the consent of the lessee or his sublessee for physical harm caused by the condition after the lessee has taken possession, if**

**(a) the lessee does not know or have reason to know of the condition or the risk involved, and**

**(b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk.**
**(2) If the lessee actively conceals the condition, the liability stated in Subsection (1) continues until the lessee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.**

Source: Legal > States Legal - U.S. > Delaware > Restatements & Jurisprudences > Torts > **Restatement 2d, Torts -
Rule Sections** 🛈

TOC: Restatement 2d, Torts - Rule Sections  > / . . . /  > Topic 3- Liability of Lessors of Land to Persons on the Land  >
**§ 359 Land Leased for Purpose Involving Admission of Public**

*Restatement of the Law, Second, Torts, § 359*

Restatement of the Law, Second, Torts
Copyright (c) 1965, The American Law Institute

◆ Case Citations

Rules and Principles

Division 2 - Negligence

Chapter 13 - Liability for Condition and Use of Land

Topic 3 - Liability of Lessors of Land to Persons on the Land

Restat 2d of Torts, § 359

§ 359 Land Leased for Purpose Involving Admission of Public

**A lessor who leases land for a purpose which involves the admission of the public
is subject to liability for physical harm caused to persons who enter the land for
that purpose by a condition of the land existing when the lessee takes possession,
if the lessor**

**(a) knows or by the exercise of reasonable care could discover that the condition
involves an unreasonable risk of harm to such persons, and**

**(b) has reason to expect that the lessee will admit them before the land is put in
safe condition for their reception, and**

**(c) fails to exercise reasonable care to discover or to remedy the condition, or
otherwise to protect such persons against it.**

Source: Legal > States Legal - U.S. > Delaware > Restatements & Jurisprudences > Torts > **Restatement 2d, Torts - Rule Sections** 🔲
TOC: Restatement 2d, Torts - Rule Sections > / . . . / > Topic 3- Liability of Lessors of Land to Persons on the Land >
      **§ 360 Title Parts of Land Retained in Lessor's Control Which Lessee Is End to Use**

*Restatement of the Law, Second, Torts, § 360*

Restatement of the Law, Second, Torts
Copyright (c) 1965, The American Law Institute

◆ Case Citations

Rules and Principles

Division 2 - Negligence

Chapter 13 - Liability for Condition and Use of Land

Topic 3 - Liability of Lessors of Land to Persons on the Land

Restat 2d of Torts, § 360

§ 360 Title Parts of Land Retained in Lessor's Control Which Lessee Is End to Use

 **A possessor of land who leases a part thereof and retains in his own control any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe.**

Source: Legal > States Legal - U.S. > Delaware > Restatements & Jurisprudences > Torts > Restatement 2d, Torts - Rule Sections ⓘ
TOC: Restatement 2d, Torts - Rule Sections > / . . . / > Topic 3- Liability of Lessors of Land to Persons on the Land > § 361 Parts of Land Retained in Lessor's Control But Necessary to Safe Use of Part Leased

*Restatement of the Law, Second, Torts, § 361*

Restatement of the Law, Second, Torts
Copyright (c) 1965, The American Law Institute

◆ Case Citations

Rules and Principles

Division 2 - Negligence

Chapter 13 - Liability for Condition and Use of Land

Topic 3 - Liability of Lessors of Land to Persons on the Land

Restat 2d of Torts, § 361

§ 361 Parts of Land Retained in Lessor's Control But Necessary to Safe Use of Part Leased

**A possessor of land who leases a part thereof and retains in his own control any other part which is necessary to the safe use of the leased part, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care**

**(a) could have discovered the condition and the risk involved, and**

**(b) could have made the condition safe.**

Source:  Legal > States Legal - U.S. > Delaware > Restatements & Jurisprudences > Torts > **Restatement 2d, Torts -
         Rule Sections** 🔢
TOC:  Restatement 2d, Torts - Rule Sections  > / . . . /  > Topic 3- Liability of Lessors of Land to Persons on the Land  >
      § 362 Negligent Repairs by Lessor

*Restatement of the Law, Second, Torts, § 362*

Restatement of the Law, Second, Torts
Copyright (c) 1965, The American Law Institute

◆ Case Citations

Rules and Principles

Division 2 - Negligence

Chapter 13 - Liability for Condition and Use of Land

Topic 3 - Liability of Lessors of Land to Persons on the Land

Restat 2d of Torts, § 362

§ 362 Negligent Repairs by Lessor

**A lessor of land who, by purporting to make repairs on the land while it is in the
possession of his lessee, or by the negligent manner in which he makes such
repairs has, as the lessee neither knows nor should know, made the land more
dangerous for use or given it a deceptive appearance of safety, is subject to liability
for physical harm caused by the condition to the lessee or to others upon the land
with the consent of the lessee or sublessee.**

**CAVEAT:  Caveat:**

The Institute expresses no opinion as to whether there may not be other situations in which a
lessor who has entered upon performance of an undertaking to repair may be subject to
liability, where he is committed to the undertaking and cannot terminate it without leaving an
unreasonable risk of serious harm to the lessee, or to others on the land with his consent,
even though the risk has not been increased and no deceptive appearance of safety has been
created.

Service: Get by LEXSEE®
Citation: 2004 u.s. dist. lexis 3050

*2004 U.S. Dist. LEXIS 3050, \**

SHIRLEY CENTANNI VERSUS UNITED STATES POSTAL SERVICE and UNITED STATES OF AMERICA

<u>View the Full Docket from LexisNexis CourtLink for 2:03cv627</u>
CIVIL ACTION NO. 03-627 SECTION "N"

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

2004 U.S. Dist. LEXIS 3050

February 27, 2004, Decided
February 27, 2004, Filed, Entered

**DISPOSITION:** [\*1] Motion to Dismiss, or in Alternative, Motion for Summary Judgment, filed by United States GRANTED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff pedestrian sued defendant United States under the Federal Tort Claims Act (FTCA), alleging that the pedestrian's injuries from a fall on property of a government post office was caused by the government's negligent failures to maintain the property and warn of a dangerous condition. The government moved to dismiss the complaint or for summary judgment.

**OVERVIEW:** The pedestrian caught her foot on a chain from a broken chain fence and fell on tree roots while traversing a short cut to the entrance of the post office. The court held that, since the pedestrian did not identify any specific individuals who were negligent in any specific manner, it appeared that the pedestrian was alleging general premises liability which was not actionable against the government under the FTCA. In any event, the pedestrian failed to show that the broken fence and roots constituted an unreasonably dangerous condition since any danger was obvious. The chain and the roots were clearly visible, and the pedestrian fell during daylight and was familiar with the existence of the chains and the tree roots. Further, the pedestrian admitted taking the short cut because she was in a hurry and was carrying a package at the time of the fall, and it was undisputed that there were no reports of prior falls in the area and no complaints concerning the condition of the area.

**OUTCOME:** The government's motion was treated as a motion for summary judgment and the motion was granted.

**CORE TERMS:** chain, unreasonably dangerous, roots, summary judgment, sidewalk, path, moving party, landowner, omission, broken, woman, fence, photographs, premises liability, sovereign immunity, potential victim, genuine issue, material fact, risk of harm, duty of care, short cut, live oak, pedestrian, deposition, short-cut, breached, walked, owed, undisputed, observe

**LexisNexis(R) Headnotes** ◆ <u>Hide Headnotes</u>

Civil Procedure > <u>Summary Judgment</u> > <u>Standards</u> > <u>Appropriateness</u> 

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 3050          Page 2 of 7

Case 1:06-cv-00499-GMS     Document 7-13     Filed 01/12/2007     Page 2 of 7

Civil Procedure > Summary Judgment > Standards > Materiality 

Civil Procedure > Summary Judgment > Supporting Materials > Affidavits

*HN1* Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview 

*HN2* A party moving for summary judgment bears the burden of showing that there is an absence of evidence to support the nonmoving party's case. If the moving party meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. A dispute over a material fact is genuine if the evidence is such that a jury reasonably could return a verdict for the nonmoving party. The substantive law determines which facts are material. More Like This Headnote

Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > State Immunity 

Governments > Federal Government > Claims By & Against

*HN3* The United States is immune from suit, except to the extent it has waived its sovereign immunity. More Like This Headnote

Administrative Law > Sovereign Immunity

Civil Procedure > Federal & State Interrelationships > Sovereign Immunity > State Immunity 

Governments > Federal Government > Claims By & Against

*HN4* The Federal Tort Claims Act is a limited waiver of sovereign immunity, allowing suits for damages caused by the negligent or wrongful act or omission of any employee of the government. More Like This Headnote

Administrative Law > Sovereign Immunity

Civil Procedure > Federal & State Interrelationships > Choice of Law > Forum & Place 

Governments > Federal Government > Claims By & Against

*HN5* For the United States to be subject to suit under the Federal Tort Claims Act, the injury must have been caused under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C.S. § 1346 (b). More Like This Headnote

Administrative Law > Sovereign Immunity 

Torts > Public Entity Liability > Liability > General Overview 

Torts > Strict Liability > General Overview 

*HN6* The Federal Tort Claims Act does not permit suits for general premises liability to the extent that such theories resemble strict liability as opposed to a more focused approach that requires the court to consider the actor whose negligence might be imputed to the government under state law.  More Like This Headnote

Torts > Negligence > Duty > General Overview 

Torts > Negligence > Proof > Elements 

*HN7* To prevail in a negligence action under Louisiana law, a plaintiff must prove that: (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendant owed a duty of care to the plaintiff; (3) the requisite duty was breached by the defendant; and (4) the risk of harm was within the scope of protection afforded by the duty breached.  More Like This Headnote

Torts > Premises Liability & Property > General Premises Liability > General Overview 

*HN8* Where the alleged negligence concerns an alleged defect in a premises, the determination of whether the custodian owed a duty of care turns upon whether the condition was unreasonably dangerous. The absence of an unreasonably dangerous condition implies the absence of a duty.  More Like This Headnote

Torts > Premises Liability & Property > General Premises Liability > General Overview 

*HN9* The mere fact that a pedestrian falls does not elevate the condition of a walkway to an unreasonably dangerous defect.  More Like This Headnote

Torts > Negligence > General Overview 

*HN10* The determination of whether a thing presents an unreasonable risk of harm involves numerous considerations, which cannot be applied mechanically. In addition to balancing the likelihood and magnitude of harm against the utility of the thing, the trier of fact should consider a broad range of social, economic, and moral factors including the cost to a defendant of avoiding the risk and the social utility of the plaintiff's conduct at the time of the accident. The lack of prior accidents is an important factor to be considered in evaluating the risk of harm. Another factor is the degree to which a danger may be observed by a potential victim.  More Like This Headnote

Torts > Negligence > Duty > General Overview 

*HN11* In a trip and fall case, the duty is not solely with the landowner. A pedestrian has a duty to see that which should be seen and is bound to observe his course to see if his pathway is clear.  More Like This Headnote

Torts > Premises Liability & Property > General Premises Liability > General Overview 

*HN12* The degree to which a danger may be observed by a potential victim is one factor in the determination of whether the condition is unreasonably dangerous.  More Like This Headnote

Torts > Premises Liability & Property > General Premises Liability > General Overview 

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 3050    Page 4 of 7

Case 1:06-cv-00499-GMS    Document 13    Filed 01/12/2007    Page 4 of 7

*HN13* A landowner is not liable for an injury which results from a condition which should have been observed by the individual in the exercise of reasonable care or which was as obvious to a visitor as it was to the landowner.  <u>More Like This Headnote</u>

**COUNSEL:** For SHIRLEY CENTANNI, plaintiff: David Greenberg, Adrian Frank LaPeyronnie, III, Molaison & Greenberg, LLC, Gretna, LA.

For UNITED STATES POSTAL SERVICE, UNITED STATES OF AMERICA, defendants: Fred Turner Hinrichs, U. S. Attorney's Office, New Orleans, LA.

**JUDGES:** KURT D. ENGELHARDT, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KURT D. ENGELHARDT

**OPINION: ORDER AND REASONS**

Before the Court is a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, filed by United States. For the reasons that follow, the motion is GRANTED.

## I. BACKGROUND

Plaintiff, Shirley Centanni, brings this action under the <u>Federal Tort Claims Act</u> ("FTCA"), seeking damages for injuries sustained when she fell outside the Post Office located on 4th Street in Gretna, Louisiana. On March 19, 2002, Ms. Centanni parked her vehicle in a rear parking lot and walked along the sidewalk towards 4th Street. As she neared 4th Street, Ms. Centanni encountered a woman in her path, depositing mail in the collection boxes located on the sidewalk. Because the woman was blocking her path, Ms. Centanni **[*2]** decided to leave the sidewalk and take a "short-cut" between a live oak tree and the building. For years, the Postal Service has attempted to discourage such short-cuts with "keep off grass" signs, and has periodically erected posts and a chain fence to close off the passage by the live oak tree. However, it has become commonplace for customers to step over and around the chains, and some have gone so far as to break the chains and damage the posts. In attempting to traverse the area, Ms. Centanni allegedly caught her right foot on one of the chains that angled down from a cement post and fell on the tree roots.

On June 18, 2002, Ms. Centanni filed an administrative claim with the Postal Service, which was denied for a lack of negligence on September 13, 2002. On February 28, 2003, Plaintiff filed suit the FTCA, alleging that the United States Postal Service had been negligent in that it had failed to keep and maintain a safe premises; failed to observe all relevant regulations and laws for the upkeep and maintenance of public facilities; and failed to inspect, correct, and/or warn about a dangerous and defective condition.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard:  [*3]

The government presents its motion as one to dismiss pursuant to <u>Rule 12(b)(1)</u> or, alternatively, for summary judgment pursuant to <u>Rule 56</u>. Considering that both sides have submitted materials outside the pleadings, the motion will "be treated as one for summary judgment and disposed of as provided in <u>Rule 56</u>." <u>Fed. R. Civ. P. 12(b)</u>.

*HN14* "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" <u>*Kee v. City of Rowlett, Texas*, 247 F.3d 206, 210 (5th Cir.)</u>, (quoting <u>*Celotex Corp. v.*</u>

Get a Document by Citation - 2004 U.S. Dist. LEXIS 3050

Case 1:06-cv-00499-GMS    Document 7-13    Filed 01/12/2007    Page 5 of 7    Page 5 of 7

*Catrett,* 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) (quoting *Fed. R. Civ. P. 56(c)*)), *cert. denied,* 534 U.S. 892, 151 L. Ed. 2d 149, 122 S. Ct. 210 (2001). **HN2** "The moving party bears the burden of showing ... that there is an absence of evidence to support the moving party's case." *Id.* at 210. If the moving party meets this burden, "the nonmovant must go beyond the pleadings **[*4]** and designate specific facts showing that there is a genuine issue for trial." *Id.* "A dispute over a material fact is genuine if the evidence is such that a jury reasonably could return a verdict for the nonmoving party." *Id.* (internal quotations omitted). "The substantive law determines which facts are material." *Id.* at 211.

## B. Federal Tort Claims Act (FTCA):

**HN3** The United States is immune from suit, except to the extent it has waived its sovereign immunity. *FDIC v. Meyer,* 510 U.S. 471, 477, 127 L. Ed. 2d 308, 114 S. Ct. 996 (1994). **HN4** The FTCA is a limited waiver of its sovereign immunity, allowing suits "for damages 'caused by the negligent or wrongful act or omission of any employee of the Government ....'" *Aretz v. United States,* 604 F.2d 417, 426 (5th Cir. 1979) (quoting 28 U.S.C. § 1346(b)). **HN5** For the United States to be subject to suit under the FTCA, the injury must have been caused "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). **[*5]** Here, the alleged acts and omissions occurred in Louisiana. Thus, the question for the Court is whether, under the circumstances presented here, a private person would be liable under Louisiana's law of negligence.

The factual basis for this action against the United States is the presence of a broken chain fence on the path of a "short cut" to the entrance of the Gretna Post Office. The plaintiff has alleged that her injuries were caused by the negligence of the Post Office in the failure to maintain the area and to warn about the alleged dangerous condition. However, the Complaint does not allege that *specific* individuals were negligent in any *specific* manner in relation to the broken chain. Thus, it appears that the substance of Ms. Centanni's claim is one of premises liability, which fails to state a claim under the FTCA. See *Perkins v. United States,* 1999 U.S. Dist. LEXIS 3390, 1999 WL 148442, p. 2 (E.D. La.) (Sear, J.) **HN6** ("the FTCA does not permit suits for general premises liability to the extent that such theories resemble strict liability as opposed to a 'more focused approach that requires the court to [consider] ... the actor whose negligence might be imputed to the government **[*6]** under state law.'"), quoting *Berkman v. United States,* 957 F.2d 108, 113 (4th Cir. 1992).

Even assuming the allegations, on their face, are sufficient to establish subject matter jurisdiction and to state a claim for negligence, the United States advances summary judgment evidence tending to show that there was no negligence by the defendant in connection with the broken chain fence.

## C. Negligence Under Louisiana Law:

**HN7** To prevail in a negligence action under Louisiana law, a plaintiff must prove that: "1) the conduct in question was the cause-in-fact of the resulting harm; 2) defendant owed a duty of care to plaintiff; 3) the requisite duty was breached by the defendant; 4) the risk of harm was within the scope of protection afforded by the duty breached." *Peterson v. Gibraltar Savings & Loan,* 733 So.2d 1198, 1203-04 (La. 1999).

**HN8** Where, as here, the alleged negligence concerns an alleged defect in a premises, the determination of whether the custodian owed a duty of care turns upon whether the condition was "unreasonably dangerous." *Williams v. Leonard Chabert Medical Center,* 744 So.2d 206, 209 (La. App. 1st Cir.1999), **[*7]** *writ denied,* 754 So. 2d 974 (La. 2000). See also *Rigdon v. United States,* 2003 U.S. Dist. LEXIS 4836, 2003 WL 1618569 (E.D. La.). The

Get a Document by Citation 2004 U.S. Dist. LEXIS 3050

Case 1:06-cv-00499-GMS   Document 7-13   Filed 01/12/2007   Page 6 of 7   Page 6 of 7

"absence of an unreasonably dangerous condition ... implies the absence of a duty." *Williams,* 744 So.2d at 209. *HN9* The mere "fact that a pedestrian falls does not elevate the condition of the walkway to an unreasonably dangerous defect." *Id.* at 211. Rather, *HN10* the determination of "whether a thing presents an unreasonable risk of harm involves numerous considerations," which "cannot be applied mechanically." *Id.* "In addition to balancing the likelihood and magnitude of harm against the utility of the thing, the trier of fact should consider a broad range of social, economic, and moral factors including the cost to defendant of avoiding the risk and the social utility of plaintiff's conduct at the time of the accident." *Id.* "The lack of prior accidents is an important factor to be considered in evaluating the risk of harm." *Id.* at 210. Another factor is the "degree to which a danger may be observed by a potential victim." *Id.* at 211.

Additionally, *HN11* "in a trip and fall case, the **[*8]** duty is not solely with the landowner. A pedestrian has a duty to see that which should be seen and is bound to observe his course to see if his pathway is clear." *Id.,* citing *Carr v. City of Covington,* 477 So.2d 1202, 1204 (La. App. 1 Cir. 1985), *writ denied,* 481 So. 2d 631 (La. 1986). *HN12* "The degree to which a danger may be observed by a potential victim is one factor in the determination of whether the condition is unreasonably dangerous." *Id.,* citing *Wallace v. Slidell Memorial Hospital,* 509 So.2d 69, 72 (La. App. 1 Cir. 1987). *HN13* "A landowner is not liable for an injury which results from a condition which should have been observed by the individual in the exercise of reasonable care or which was as obvious to a visitor as it was to the landowner." *Id.,* citing *Barnes v. New Hampshire Insurance Company,* 573 So.2d 628, 630 (La. App. 2 Cir. 1991).

In the instant case, photographs of the area where the plaintiff fell were attached as exhibits to the defendant's Motion and to the plaintiff's Opposition. It is apparent from the photographs that there is a post, from which two chains angle down to the ground, and **[*9]** that the area is covered with tree roots. Moreover, what is obvious in the photographs was also obvious to Ms. Centanni on the day of the accident.

Here, it is undisputed that the accident in question occurred around 10:15 a.m. in broad daylight. Plaintiff does not dispute that she was familiar with the existence of the chains and the tree roots, having walked through the area on at least two prior occasions. In fact, in her deposition, Ms. Centanni admits she was aware that the chains had been down for several months. Plaintiff does not dispute that she was carrying a package at the time of her fall, nor does Plaintiff dispute that her only explanation for taking the "short cut" was that she was in a hurry. It is further undisputed that prior to Plaintiff's fall, there were no reports of anyone falling in the area, and the Postal Service had never received a complaint from the public with regard to the chains, posts or tree roots, or how the area was maintained. Had Plaintiff waited for the woman standing in her path to move, she could have continued safely along the sidewalk. In view of all of these factors, no reasonable fact-finder could find from the record evidence that the **[*10]** chain (or the tree roots, for that matter) constituted an unreasonably dangerous condition. Thus, the Post Master had no duty to remedy the situation or to provide any further warning.

### III. CONCLUSION

Accordingly, **IT IS ORDERED** that the Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, filed by United States, is **GRANTED.**

New Orleans, Louisiana, this 27th day of February, 2004.

KURT D. ENGELHARDT

UNITED STATES DISTRICT JUDGE

Service: **Get by LEXSEE®**
Citation: **2004 u.s. dist. lexis 3050**
View: Full
Date/Time: Friday, January 12, 2007 - 1:09 PM EST



About LexisNexis  | Terms & Conditions
Copyright ©  2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.